Noor **MOHAMMED, M.D., Plaintiff,**

v.

**Robert H. MATHOG, M.D., and Wayne State University School of Medicine, Defendants.**

Civ. No. 83–2948.

United States District Court, E.D. Michigan, S.D.

May 28, 1986.

Leonard A. Siudara, Troy, Mich., for plaintiff.

Patricia Eames, Office of General Counsel, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This action concerns the academic dismissal of plaintiff Noor Mohammed from Wayne State University's Otolaryngology (Ear, Nose, Throat/ENT) residency training program. His participation in the program was discontinued after six months notice and after he twice had been placed on academic probation. Plaintiff's complaint, filed pursuant to 42 U.S.C. § 1983, alleges that his dismissal from the program violated his rights to substantive and procedural due process and to the equal protection of the law as guaranteed by the Fourteenth Amendment. The material facts are undisputed and the matter is before the court on defendant's motion for summary judgment.

Plaintiff began his ENT residency on January 1, 1980. He spent the first six months of training in the laboratory as planned by the parties prior to his acceptance into the program. On July 1, 1980, the University renewed his participation in the residency program for another year.

Plaintiff met with and was evaluated by faculty at the end of that year. Although his attitude and attendance were found to be exemplary, the University placed him on academic probation. The letter notifying plaintiff of his probationary status advised him that significant deficiencies had been noted in both his general fund of basic knowledge and his clinical performance progress. The faculty further expressed its belief that plaintiff's low scores on an objective in-training examination accurately reflected his academic limitations, based on faculty observations of his poor performance during conferences and ward rounds. Plaintiff's surgical technique was found unsatisfactory for his level of training and was deemed marginal at best. A special advisor with whom plaintiff would meet weekly was assigned and plaintiff was informed that he would be reevaluated in three months.

Plaintiff again met with the faculty in October of 1981. Upon reevaluation, improvement was observed in plaintiff's fund of knowledge, but his technical skills were found weak and his performance marginal. It was recommended, with plaintiff's concurrence, that his weekly meetings with the special advisor continue, but his probationary status was discontinued. Plaintiff was cautioned, however, that failure to improve could result in reimposition of probationary status and/or dismissal from the program. Plaintiff's December, 1981 evaluation revealed essentially no change from the last assessment. He was still functioning at a marginal level.

Six months later, in June of 1982, plaintiff met again with the Department of Otolaryngology to discuss his progress. His performance and presentation continued to be considered marginal; he was at the 16th

percentile on examination; concern continued as to his knowledge and surgical skills; his research activities were found minimal; and his teaching was limited. In general, the faculty concluded that his performance bordered on "unsatisfactory/satisfactory and should be considered marginal." He was warned that if his status remained unchanged upon graduation, there would be limitations recommended on his practice of otolaryngology. A new advisor was assigned with whom it was recommended that plaintiff should meet on a regular basis.

The faculty met again with plaintiff the following month. The opportunity to observe him for an additional four weeks led the faculty to conclude that his performance was unsatisfactory for an individual at the third year level. Plaintiff was placed on probation and cautioned that if he was not relieved of probation upon his December, 1982 evaluation, he would be asked to resign from the program.

In August of 1982, plaintiff's surgical performance was found inadequate by Dr. Robert Mathog on three separate occasions. Following one of these incidents, Dr. Mathog informed plaintiff that "things were not going well for him at this point." Plaintiff requested he be given the full six months for evaluation and Dr. Mathog granted his request.

In early December of 1982, plaintiff met with Dr. Mathog who discussed with him the faculty's unfavorable observations and recommendations for his future. Shortly thereafter the Department of Otolaryngology convened a formal evaluation meeting and determined that plaintiff's participation in the ENT residency program would terminate on June 30, 1983. The faculty offered to assist plaintiff in finding a placement in another program should he so desire. Plaintiff was formally notified of the decision in a letter dated December 20, 1983. He had been unable to attend the evaluation, having been called out of town.

Plaintiff met with Dr. Mathog again in January, 1983 to discuss his situation and was informed that he might gather and submit letters of recommendation from non-faculty physicians familiar with his work, and from faculty members who might support his continuation in the program. In February, 1983, plaintiff met with Dr. Mathog to review his program status and evaluation records. In June of 1983, plaintiff attended a faculty evaluation conference convened to review his program performance and status. After this reconsideration, the faculty's determination that plaintiff's performance was unsatisfactory remained unchanged and plaintiff filed this action.

This court dismissed plaintiff's claims of misrepresentation and promissory estoppel in July, 1984. The case is now before the court on defendant's motion for summary judgment on the due process and equal protection claims.

■ Plaintiff's complaint asserts a property interest in his continued residency training and a liberty interest in maintaining his professional reputation. He alleges that as of June 30, 1982 he had complied with all requirements for board certification examinations of the American Board of Otolaryngology except for the satisfactory completion of a residency program. He argues that defendants' decision to terminate his residency was arbitrary and capricious.

In *Regents of the University of Michigan v. Ewing*, 474 U.S. ——, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985), the Court held that, assuming the existence of a constitutionally protected property right in continued enrollment in medical school, the question to be answered in deciding a substantive due process claim is whether the University acted arbitrarily in dismissing the student. The Court cautioned:

When judges are asked to review the substance of a genuinely academic decision, ... they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee re-

sponsible did not actually exercise professional judgment. *Id.* 106 S.Ct. at 513.

In advising judicial restraint in reviewing the substance of academic decisions, the Court expressed its reluctance "to trench on the prerogatives of state and local educational institutions and [its] responsibility to safeguard their academic freedom." *Id.* at 514. Further noted was the unsuitability of the federal courts to evaluate "the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decision-making.'" *Id.* at 514, quoting *Board of Curators, University of Missouri v. Horowitz*, 435 U.S. 78, 89–90, 98 S.Ct. 948, 954–55, 55 L.Ed.2d 124 (1978).

This "narrow avenue for judicial review," precludes the conclusion here that the decision to dismiss plaintiff from the ENT residency program was such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment. *Ewing,* 106 S.Ct. at 514. To the contrary, defendants had good reason to dismiss plaintiff. His academic and clinical performance were examined at length and determined to be unsatisfactory. At best, his skills were characterized as marginal, after substantial opportunity to improve. Moreover, the decision to terminate him from the program was reached after a number of periodic reviews at which the entire full-time faculty discussed and evaluated his progress in all relevant areas. The record unmistakeably demonstrates that the faculty's decision was made "conscientiously and with careful deliberation." *Ewing* at 513.

Plaintiff's attempt to distinguish *Ewing* as factually dissimilar from his case is unpersuasive. The fact that plaintiff's academic record may have been superior to Ewing's is irrelevant. The crucial point is that this faculty, after careful consideration, found that plaintiff's performance did not meet the standards necessary for continuance in this residency program. Nor is it material that plaintiff received financial compensation from the University while he was enrolled. As a resident, plaintiff was undeniably a student, subject to the academic requirements of the ENT program. His dismissal from the program clearly rested upon a professional judgment well within the realm of academic decision-making when viewed against the background of his entire career at Wayne State University.

The same reasoning serves to defeat plaintiff's claim of violation of his procedural due process rights. In *Horowitz*, the Court expressly considered the question of what procedures must be accorded to a student at a state educational institution whose dismissal may constitute a deprivation of liberty or property within the meaning of the Fourteenth Amendment. The Court held that in the case of an academic dismissal, due process is satisfied if the school fully informed the student of the faculty's dissatisfaction with his progress, as well as the dangerous consequences this posed to continued enrollment, and if the ultimate decision to dismiss the student was careful and deliberate. *Id.* 435 U.S. at 85, 98 S.Ct. at 952.

Noting the significant differences between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct, the Court emphatically found that a hearing is not required in connection with the former. *Id.* at 87, 98 S.Ct. at 953.

A school is an academic institution, not a courtroom or administrative hearing room.

\* \* \* \* \* \*

Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative factfinding proceedings to which we have traditionally attached a full hearing requirement.... [An academic] judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the deci-

sion of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

*Id.* at 90, 98 S.Ct. at 955.

■ Plaintiff's claim that his absence from the final faculty meeting at which the decision to dismiss him was reached deprived him of procedural due process is clearly without merit. Due process does not require that a student be present when the crucial decision to terminate him for unsatisfactory academic performance is made. Although plaintiff did not attend the final faculty meeting, he had been repeatedly informed of the faculty's dissatisfaction with his fund of knowledge and his clinical skills. He was provided ample opportunity to defend himself and to improve his performance. He was also fully apprised of the consequences of a failure to do so. Finally, as discussed with respect to plaintiff's substantive due process claim, the decision to dismiss him was both careful and deliberate. Therefore, defendants' actions fully comported with the requirements of due process.

■ Plaintiff's equal protection challenge is ill-conceived and must also be dismissed. He has alleged no discrimination on the basis of race, age, sex, national origin, religion or disability. Nor is the infringement of a fundamental right at issue. Nevertheless, plaintiff has asserted the remarkable position that an equal protection analysis is applicable because the University has allegedly created two classifications of students. He argues that he alone is in one class, while two other residents whose performances in some areas were found on occasion to be less than satisfactory make up the second class.

The court finds the formulation of plaintiff's claim untenable. The Equal Protection Clause prevents governments from making *improper* classifications and from applying proper classifications in such a way as to indicate that improper classifications are being drawn in the administrative process.

The equal protection clause guarantees that similar individuals will be dealt with in a similar manner by the government. It does not reject the government's ability to classify persons or 'draw lines' in the creation and application of laws, but it does guarantee that those classifications will not be based upon impermissible criteria or arbitrarily used to burden a group of individuals. If the government classification relates to a proper governmental purpose then the classification will be upheld. Such a classification does not violate the guarantee when it distinguishes persons as 'dissimilar' upon some permissible basis in order to advance the legitimate interests of society. Those who are treated less favorably by the legislation are not denied equal protection of the law because they are not similarly situated to those who receive the benefit of the legislative classification.

It should be noted that the equal protection guarantee has nothing to do with the determination of whether a specific individual is properly placed within a classification. Equal protection tests whether the classification is properly drawn.

J. Nowak, R. Rotunda, & J.N. Young, *Handbook on Constitutional Law,* 519 (1978).

■ In this case, the only classification at issue is the distinction between those students who perform satisfactorily and those who do not. Such a classification reflects a proper purpose and the determination of which students fit into each classification is preeminently within the expertise and authority of the medical school faculty. Equal protection merely guarantees that the faculty's decision regarding a student's classification will not be based upon impermissible criteria. Plaintiff's failure to allege faculty use of any impermissible criteria, must necessarily result in the dismissal of his equal protection claim. As noted above, if the classification itself is

proper, the equal protection guarantee has nothing to do with the determination of whether a specific individual is properly placed within it. It is procedural due process which deals with the adjudication of individual claims.

This case presenting no genuine issues of material fact, and the court finding plaintiff's claims without merit as a matter of law,

IT IS ORDERED that summary judgment be and is hereby granted for defendants and the case must be and hereby is dismissed.

IT IS SO ORDERED.