James ROSS, M.D., Appellant,

v.

UNIVERSITY OF MINNESOTA, et al., Respondent.

No. C8–88–2449.

Court of Appeals of Minnesota.

May 2, 1989.
Review Denied July 12, 1989.

James Ross, M.D., Burnsville, pro se.

Jan D. Halverson, Minneapolis, for respondents.

Considered and decided by PARKER, P.J., and RANDALL and KALITOWSKI, JJ., without oral argument.

## OPINION

PARKER, Judge.

James Ross, M.D., commenced an action after being dismissed from the University of Minnesota's psychiatry residency program. Ross sought injunctive and declaratory relief, and damages for the University's alleged breach of an "employment" contract, for denial of his substantive and procedural due process rights, for infliction of emotional distress, and for defamation.

The trial court granted summary judgment dismissing his complaint against the University, and Ross appeals. We affirm.

## FACTS

Dr. James Ross joined the University of Minnesota's psychiatry residency program on July 1, 1985, as a second-year resident. He received a salary/stipend of $21,900 which would increase with each year completed and received customary fringe benefits. His salary was taxed as earned income. Each semester Ross paid approximately $190 in tuition to the University. Residents must satisfactorily complete four-month rotations related to specific aspects of psychiatry before they will be promoted. In each rotation the residents work directly with patients. Additionally, they are required to take courses and attend teaching rounds and seminars.

A Progress Committee comprised of faculty monitors the residents' educational progress, meeting every three to four months. The committee bases its evaluations of resident performance upon review of written assessments by service chiefs and supervisors. The "Due Process Procedures for Resident Evaluation" (Procedures) require that the resident be offered each evaluation for review and signature. When performance problems are identified, the committee informs the resident in writing. The resident also meets with the residency director to review the concerns. If the concerns are of sufficient magnitude to raise questions as to continuation in the program, the resident is notified in writing and given a period of time to address the deficiencies. The committee then meets to review the performance during the probationary period. At that point the committee may dismiss the resident immediately, withhold credit until the problems have been corrected, offer credit but elect not to continue the resident in the program if performance is still marginal, or advance the resident to the next level of training.

From the beginning of his tenure as a resident, Dr. Ross received mixed reviews. Within a month, Ross's supervisors expressed concerns about his anxiety, preoc-

cupation, slurred speech, and difficulty remembering things. After discussing these concerns with his supervisors, Ross agreed to hospitalization for depression. He returned to the residency after three weeks, satisfactorily completed the rotation, and received full credit.

In January 1986 the director of the psychiatry residency program, Dr. Halikas, notified Ross in writing that the Progress Committee was concerned about interpersonal issues. Halikas and Ross also met to discuss concerns which included Ross' failure to respond to pages, slurred speech, incomplete emergency room notes, and his habit of covering his mouth with his hand during interviews.

In February 1986 a psychologist with whom Ross worked told him about a rumor circulating that Ross was a chronic cocaine abuser. While the psychologist stressed that he did not believe it, he notified Ross' supervisors of the rumor. Ross alleges that the psychologist had told him that the rumor would not go beyond him.

In March the committee placed Ross on probation for the indefinite future. Dr. Halikas' letter notifying Ross of the decision stated:

> You are felt to have trouble prioritizing task assignments, you are unable to organize your work efficiently, unable to work rapidly enough for the situation, and unable to be sufficiently flexible to handle a variety of tasks simultaneously.

The probation decision was based in part on letters of complaint from nursing and other hospital staff and evaluations by supervising physicians. The evaluations, however, also noted that Ross was very dedicated to his patients and worked hard.

At the meeting to discuss the letter, Dr. Halikas recommended that Ross obtain further evaluation. Ross was subsequently diagnosed as suffering from attention deficit disorder and Ritalin was prescribed. After the diagnosis, there were indications of some improvement in Ross's skills.

At its June meeting the Progress Committee determined that Ross should repeat one rotation and remain at second-year status. Dr. Halikas met with Ross to discuss the decision, explaining the need for more experience in in-patient care and emergency room management of cases. Despite the decision not to promote Ross, the University administrative system reappointed him for another year in terms of salary documentation.

Ross received conflicting evaluations of his other 1986 rotations. One physician generally praised Ross' work, indicating that he should continue in the program. Other evaluations, while noting some areas of improvement, stressed problems in treatment planning, communication, charting, and tardiness. One even noted the existence of "some potentially serious problems which may compromise [Ross'] ability to function as a psychiatrist."

On September 24, 1986, the Progress Committee decided that if Ross successfully completed his current rotation, he would be considered to have completed his second year, but he would not be recommended to the third year unless he made dramatic improvements. The letter to him reporting the decision concluded:

> However, unless there is satisfactory evidence of dramatic improvement in all of the areas of weakness previously discussed with you, including but not limited to, tardiness, poor attendance at scheduled meetings, lack of attention to detail, and lack of organizational and independent functioning skills, the Progress Committee will not recommend your promotion to the G–3 level of the Residency, and will recommend your termination from the program.

When the two met to discuss the letter, Dr. Halikas suggested that Ross start looking for another position.

In November 1986, during a week off while the University investigated a complaint against him by a patient, Ross conducted research and proposed a unique treatment for patients with tardive dyskenisia. When it appeared that the treatment might be effective, Dr. Halikas urged Ross to submit a letter to a medical journal on the subject and to work on a grant with Dr. Mackenzie to be submitted by February 1,

1987. The complaint was dropped and he returned to clinical work.

Dr. Halikas claims to have been enthusiastic about the research because he felt it might favorably impress the Progress Committee on Ross's behalf. Dr. Ross claims that Halikas assured him that publication of the letter and a timely grant application would virtually guarantee his continuation in the residency program.

By January 30, 1987, however, Halikas received two more negative evaluations of Ross's clinical work. Both found him to have poor interviewing skills. One stated that he "must continue to demonstrate improvement in interviewing technique so that *all* of his evaluations meet a minimum standard, or his progress toward completion of the residency should be delayed." The other supervising physician stated that while his observations would not support outright dismissal, he recommended that Ross be steered away from a general psychiatry practice because of his inept diagnostic and management interviews.

Dr. Halikas met with Ross to discuss the negative evaluations. Halikas indicated that it would be virtually impossible for him to remain in the residency program past his current rotation. In anticipation of the February Progress Committee meeting, Dr. Halikas also notified him that he could present favorable material to the committee. Ross submitted a large packet of materials.

Prior to the February Progress Committee meeting, Ross received two positive evaluations and submitted the grant application. His letter about his research also had been published in a weekly medical journal.

At the February 23, 1987, meeting the committee voted 8 to 0, with one abstention, not to promote Ross to the third-year residency. Therefore, he could not continue in the program. The letter stated that he would be free to reapply to the program in one to two years, but that the Committee felt

> that further remedial social skills training, further supervised clinical experience (such as employment at Anoka, St. Peter, Hennepin County ER, or in clinical projects), and clinical research involvement in your current projects, would all be useful to you in any preparation towards reapplication.

Ross subsequently commenced this litigation naming all of the Progress Committee members as defendants.

## ISSUES

1. Is a person participating in a medical residency program a student or an employee?

2. Did Ross's termination from the psychiatry residency program constitute a breach of contract?

3. Did Ross's removal from the psychiatry residency program violate his procedural or substantive due process?

4. Did respondents defame Ross in any way during his participation in the psychiatry residency program?

## DISCUSSION

On appeal from a summary judgment, this court determines only whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. Minn.R.Civ.P. 56.03; *see also Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). The evidence must be viewed in the light most favorable to the party against whom summary judgment was granted. *Abdallah, Inc. v. Martin*, 242 Minn. 416, 424, 65 N.W.2d 641, 646 (1954). When questions of law are raised, the appellate court may conduct an independent review of the question. *Service Oil, Inc. v. Triplett*, 419 N.W.2d 502, 503 (Minn.Ct.App.1988), *pet. for rev. denied* (Minn. Apr. 20, 1988).

The trial court determined as a matter of law that Ross was a student in the residency program rather than an employee, that the duty of good faith does not apply, and that receipt of the Due Process Procedures did not establish an employment contract. Further, the court determined that even if the Procedures did create a contractual relationship, no material breach occurred.

Finally, the trial court found that no genuine issues of fact existed with respect to a violation of academic due process or the presence of malice required to establish a defamation claim.

## I

■ The threshold issue in this case is whether Ross should be considered an employee of the University or a student. There are no Minnesota precedents directly determinative of the question. Reviewing the case law from other jurisdictions and specialized courts, we find that no clear dichotomy exists. A resident position is more a hybrid, bearing some of the attributes of a student and some of an employee. Whether the resident is considered an employee or a student depends on the context in which the question (and a cause of action) arises.

In a taxation context, courts have found that residents are employees to the extent that their salaries/stipends are taxable income. *See, e.g., Hembree v. United States,* 464 F.2d 1262, 1265 (4th Cir.1972); *Wertzberger v. United States,* 441 F.2d 1166 (8th Cir.1971). Residents are expressly included as employees under the Minnesota workers' compensation statute. *See* Minn.Stat. § 176.011, subd. 9(17) (1988).[1] In the medical malpractice context, residents are considered hospital employees for purposes of liability under a respondeat superior theory. *See, e.g., Moeller v. Hauser,* 237 Minn. 368, 379, 54 N.W.2d 639, 646 (1952).

In collective bargaining cases, jurisdictions vary. Some have found that residents are employees within the meaning of the National Labor Relations Act and as such are able to organize, while others have found that residents may not organize because of their student status. In *Cedars–Sinai Medical Center,* 91 L.R.R.M. 1398, 223 N.L.R.B. 251 (1976), the NLRB found that residents are not employees

within the meaning of the Act because they are primarily engaged in graduate educational training. *Id.* at 1400, 223 N.L.R.B. at 253. The Board found that the residents

> participate in these programs not for the purpose of earning a living; instead they are there to pursue the graduate medical education that is a requirement for the practice of medicine. * * * The programs themselves were designed not for the purpose of meeting the hospital's staffing requirements, but rather to allow the student to develop, in a hospital setting, the clinical judgment and the proficiency in clinical skills necessary to the practice of medicine in the area of his choice.

*Id.; see also Pennsylvania Association of Interns & Residents v. Albert Einstein Medical Center,* 470 Pa. 562, 569, 369 A.2d 711, 714 (1977) (residents not employees because they do not go to work "in the true bargained-for exchange normally associated with the employer-employee relationship").

Finding medical house staff to be employees entitled to collective bargaining rights, the California Supreme Court stated that "although housestaff obviously receive intensive professional training through their work, there is substantial evidence to support the Board's finding that educational objectives are subordinate to the services they perform." *Regents of the University of California v. Public Employment Relations Board,* 41 Cal.3d 601, 621, 224 Cal.Rptr. 631, 640, 715 P.2d 590, 603 (1986).

Even those cases which hold the resident to be an employee qualify the decision by describing the position as being one of quasi-employment or a hybrid. *See House Officer's Association v. University of Nebraska Medical Center,* 198 Neb. 697, 702, 255 N.W.2d 258, 262 (1977) (housestaff are both students and employees). In *Regents*

---

1. Under the Minnesota workers' compensation statute, an employee includes

   any person who performs services for another for hire including the following:

   * * * * * *

   (17) students enrolled in and regularly attending the medical school of the University

   of Minnesota in the graduate school or postgraduate program.

   Minn.Stat. § 176.011, subd. 9 (1988). Interestingly, the statute expressly continues, "The students shall *not* be considered employees *for any other purpose.*" *Id.* (emphasis added).

*of the University of Michigan v. Michigan Employment Relations Committee*, 389 Mich. 96, 204 N.W.2d 218 (1973), the Michigan Supreme Court held that the residents were employees entitled to bargain. *Id.* at 109, 204 N.W.2d at 224. The court noted, however, that

> the scope of bargaining by the Association may be limited if the subject matter falls clearly within the educational sphere. \* \* \* Our court will not \* \* \* shirk its duty to protect the autonomy of the Regents in the educational sphere.

*Id.* at 109–10, 204 N.W.2d at 224.

Ross' tenure at the University exhibits many of the qualities of an employee. His salary/stipend was taxed, he received customary employee fringe benefits, he was directly responsible for patient care, and many of the documents pertaining to his residency referred to "employment" and "employee." There is no question, however, but that Ross was dismissed for academic reasons. The entire problem arose in the academic arena and must therefore be considered an academic problem concerning a student. We hold that the trial court was correct in determining that a resident is a student for the purpose of reviewing the decision to dismiss for academic reasons. To hold otherwise would be to threaten the autonomy of academic institutions to determine standards for the passing and failing of students. The NLRB stated:

> Were students deemed to be employees, the failure to recommend program continuation would be tantamount to discharge and thus a mandatory subject of bargaining. In all likelihood, a student protest over an unfavorable recommendation would end up before an arbitrator, with the arbitrator being asked to decide whether the subjective recommendation was academically justified—an issue not generally within the scope of most arbitrators' expertise.

*St. Clare's Hospital and The Committee of Interns and Residents*, 95 L.R.R.M. 1180, 1184, 229 N.L.R.B. 1000, 1003 (1977).

The decision to terminate a resident from a hospital-based residency program is the same as any other decision to fail a graduate student for inability to meet academic requirements. Courts have historically deferred to the decisions of academic institutions on the academic achievements or failures of their students. *See Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 90, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978); *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225–26, 106 S.Ct. 507, 514–15, 88 L.Ed.2d 523 (1985). Since we hold that Ross must be viewed as a student because of the action constituting the gravamen of his complaint, we defer to the University's expertise in the academic area.

## II

Ross argues that his 12–month reappointment in July 1986 and the Due Process Procedures given to each incoming resident together form an implied contract which the University breached by dismissing him from the residency program. We do not agree.

■ A handbook or procedures bulletin may become part of an employee's contract if sufficiently definite to meet the requirements for the formation of a unilateral contract. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn.1983). Whether the proposal is meant to be an offer is determined by the outward manifestations of the parties, not by their subjective intentions. *Id.* In *Pine River* the manual at issue constituted a unilateral contract because it outlined a definite, four-step procedure for discharge. By contrast, no such contract was found in *Hunt v. IBM Mid–America Employees Federal Credit Union*, 384 N.W.2d 853 (Minn.1986), because the manual failed to provide any definite disciplinary procedures, offering only general guidelines. *Id.* at 856–57. Likewise, in *Goodkind v. The University of Minnesota*, 417 N.W.2d 636 (Minn.1988), the supreme court held that a portion of the dental school's constitution and a particular administrative policy did not become part of a faculty member's employment contract. Under *Pine River*, the supreme court found these provisions to be general

statements of policy and insufficiently related to the terms and conditions of the employee's current employment. *Id.* at 639–40.

■ The University's Procedures do not constitute a unilateral contract of employment such that an employer-employee analysis would be applicable. While elements of contract law have been applied to the student-university relationship, "rigid importation of the doctrine has been rejected." *Abbariao v. Hamline University School of Law,* 258 N.W.2d 108, 113 (Minn. 1977). In *Abbariao* the Minnesota Supreme Court found that the school bulletin did not constitute a contract between the school and the student which required strict compliance with every provision. *Id.* at 114. The Procedures given to Ross are two pages long and outline generally the processes that will be used when a resident experiences problems meeting the academic requirements of the program.

Furthermore, Ross has not provided evidence of a material breach of the Procedures. Throughout the 18–month process, the University complied substantially with all procedures specified. The committee, through Dr. Halikas, informed Ross of every decision affecting his future in the residency program, both by letter and in personal meetings. While Ross claims that he never signed two evaluations as required in the Procedures, the evidence shows that Dr. Halikas personally discussed the contents of these evaluations with him. Although under the Procedures he had no automatic right to a hearing, the committee gave him the opportunity to submit materials in his support prior to their final decision. In fact, the committee elected to postpone its decision for one week so that members would have ample opportunity to review the voluminous packet of materials Ross submitted.

The Procedures are designed to ensure that the University's decisions which might affect a medical resident's future are not lightly made. They provide for basic due process protections in a student context. In Ross's case, the University substantially complied with its procedures to protect Ross's rights. The evidence indicates no material breach of contract in this dismissal.

### III

■ Through substantial compliance with the Procedures, the University afforded Ross all substantive and procedural due process protections owing to a student. Assuming the existence of a liberty or a property interest, in the case of academic dismissal an educational institution need not provide a hearing to a student in order to fulfill procedural due process requirements. *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 89–90, 98 S.Ct. 948, 954–55, 55 L.Ed.2d 124 (1978). Rather, the student must be aware of the faculty's dissatisfaction with his performance and the decision to dismiss must have been careful and deliberate. *Id.* at 85, 98 S.Ct. at 952; *see also Schuler v. University of Minnesota,* 788 F.2d 510, 514 (8th Cir.1986).

In order to prove a violation of substantive due process, Ross would have to demonstrate that the University acted arbitrarily in dismissing him or that the dismissal was "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985); *see also Schuler,* 788 F.2d at 515 (student would have to demonstrate that dismissal was motivated by bad faith or ill will unrelated to academic performance). Courts are ill suited

> to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decision-making.'

*Ewing,* 474 U.S. at 226, 106 S.Ct. at 515 (quoting *Horowitz,* 435 U.S. at 89–90, 98 S.Ct. at 954–55).

Ross was fully aware of the faculty's dissatisfaction with his performance. He was notified of the concerns through letters and meetings. The decision was careful and deliberate. The committee first notified Ross of interpersonal concerns in January 1986, placed him on probation in March, required him to repeat a rotation in June, and in September decided not to recommend him to third-year status unless there was dramatic improvement. The final decision to terminate Ross in February 1987 was made only after the committee had given Ross ample opportunity to improve and after it had reviewed all of the materials he submitted to them in support of his continuation in addition to those materials supporting dismissal.

It cannot be said that the University acted arbitrarily in terminating Ross, or that the decision demonstrates a total lack of professional judgment. All residents are evaluated on a regular basis and monitored by the Progress Committee. We find no evidentiary support for Ross's allegation that the decision was motivated by ill will and bad faith on Dr. Halikas' part.

### IV

Ross raises two separate defamation issues. He claims that the letter from Halikas dismissing him from the program was defamatory because it contained a phrase which was untrue and made with ill will to injure him. Additionally, he contends that the trial court erred in failing to consider his claim that statements regarding the cocaine rumor constituted defamation by slander.

■ For a statement to be defamatory, it must be communicated to someone other than the subject, false, and harmful to the subject's reputation, lowering him or her in the estimation of the community. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). A statement will be considered privileged if it is made upon a proper occasion, from a proper motive, and based upon reasonable or probable cause. *Id.* at 256–257. In a case involving a conditional privilege, actual malice must be proved. *Id.* at 257.

■ The letter dismissing Ross from the residency program stated that "the committee felt that further remedial social skills training * * * would all be useful to you in any preparation towards reapplication." This statement is not false. It was the opinion of the committee made in a context where a conditional privilege attaches. If it were false, Ross would have to demonstrate actual malice on the University's part in order to support his defamation claim. Ross presented no evidence of malice. The trial court was correct in denying this claim.

■ Nor does the cocaine rumor constitute defamation by slander on the part of the University. There is no evidence indicating any causal connection between the rumor and the University's termination of Ross. The rumor was reported to Dr. Halikas more than a year before the dismissal, and each party who discussed it with Ross indicated a belief that it was not true. Furthermore, the rumor was not referenced in any of Ross's evaluations which provided the basis for the dismissal.

### DECISION

We affirm the trial court's grant of summary judgment. Dr. Ross was a student in the University of Minnesota's psychiatry residency program for the purpose of academic dismissal; therefore, employment concepts are not applicable. The University provided Ross with all due process protections required in academic dismissal and did not defame him.

Affirmed.