692 A.2d 971

ALLYN HERNANDEZ, M.D., PLAINTIFF–RESPONDENT, v. OVERLOOK HOSPITAL, DEFENDANT–APPELLANT.

Argued January 22, 1997—Decided April 30, 1997.

69

*James E. Patterson* argued the cause for appellant (*Green-baum, Rowe, Smith, Ravin, Davis & Himmel,* attorneys).

*Christopher J. Carey* argued the cause for respondent (*Tompkins, McGuire & Wachenfeld,* attorneys; *Mr. Carey* and *Mary Ann McConeghy,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

The central issue presented in this case is whether a medical resident is entitled to counsel at an internal hearing regarding her academic termination from a private hospital's residency program. We also decide whether a court reporter may transcribe such proceedings. We hold that a medical resident does not have the right to counsel at a private academic hearing and that the hearing does not have to be transcribed.

I

Plaintiff, Dr. Allyn Hernandez, a graduate of the Universidad Central Del Caribe Medical School, was a medical resident (also known as "house staff") pursuing post-graduate training in the Internal Medicine Residency Program at Overlook Hospital, a private non-profit hospital in Summit, New Jersey. The Program consists of three years of training under the supervision of a Program Director, the Program Associate Director, various attending physicians from the hospital medical staff, and the residents, including the Chief Resident. The Program is accredited and reviewed by the Accreditation Council for Graduate Medical Education (ACGME).

By contract, a resident is entitled to remain in the Program so long as his or her services are deemed "satisfactory" by the Program Director and the Hospital. The contract expressly provides that Overlook may terminate the resident's appointment "for just and sufficient academic cause." The contract also states that a terminated resident may use the Employee Appeal Procedure as outlined in the House Staff Manual.

Plaintiff was a second-year resident when she entered into a one-year written contract with Overlook for appointment to the hospital's "House Staff" for the term of July 1, 1994, through June 30, 1995. As a second-year resident, plaintiff's right to practice medicine was very restricted. She was not a member of the medical staff, could not admit or discharge patients, and could not prescribe drugs for out-patients without the signature of a licensed physician.

Plaintiff was terminated for academic reasons in October 1994. A report prepared by the Chief Resident stated that it was the Chief Resident's opinion that plaintiff lacked the clinical judgment necessary for a second-year resident, failed to offer adequate leadership or guidance to her interns, and had difficulty with professionalism and decorum when dealing with other staff members. The Chief Resident also addressed various incidents where plaintiff improperly treated or diagnosed patients.

In addition, the Program Director, Michael Bernstein, M.D., stated that plaintiff had been counseled previously about the deficiencies in her academic performance, but failed to improve to a satisfactory level. In fact, plaintiff had been rotated into the medicine service on July 1, 1994, as an intern rather than as a supervisor because of her weakness in clinical assessment, decisionmaking, and follow-up. Dr. Bernstein states that in the exercise of his academic judgment, he terminated Dr. Hernandez because she was deficient in her academic performance in several areas, including diagnosis and academic development.

Following her termination, plaintiff, pursuant to the contract for employment, invoked the Employee Appeal Procedure set forth in the House Staff Manual. The Manual allows residents, who are terminated for academic reasons, to challenge the Program Director's decision on the grounds that the academic judgment was arbitrary, capricious, or a prejudicial judgment not based on documented evaluations. The Appeal Board consists of a Program Director other than the terminated resident's Director and the Chairman of the Department of Medical Education. The

Appeal Board's determination is final and binding on both the Hospital and the terminated resident.

Overlook notified plaintiff by letter that an Appeal Board meeting was scheduled on January 24, 1995. Plaintiff demanded that her attorney be permitted to appear and participate in the proceedings. Plaintiff also demanded that various documents, including patient records, be disclosed to her and her attorney. Overlook denied both requests.

Overlook offered the following reason to justify its decision to exclude counsel from the academic termination hearing:

> The Appeal's procedure is intended to provide a medical review by experienced physicians of a Program Director's academic judgment. It is not a legal proceeding and, therefore, no attorney (either for the hospital or the resident) will be permitted to participate or attend the meeting with the Appeal Board.

Overlook also advised plaintiff that only she, and not counsel, could review certain relevant documents and patient files at least five days prior to the hearing. The Hospital reached this decision because of its strict policy of maintaining the confidentiality of patient's records.

Nevertheless, in an effort to avoid legal proceedings and settle the dispute with plaintiff, Overlook subsequently agreed to permit plaintiff's counsel to attend the hearing, to provide advice to plaintiff, and to make brief opening and closing statements. Plaintiff's counsel was also given authority to review relevant documents, with the exception of patient records. Overlook refused, however, to allow plaintiff's counsel to present evidence or provide a shorthand reporter to transcribe the proceedings. Overlook's counsel would also be permitted to present a brief opening and closing statement to the Board.

Plaintiff, by letter, rejected Overlook's offer, insisting on the presence of counsel and a shorthand reporter at the proceeding. Plaintiff also reasserted her position that counsel should have the right to present evidence on her behalf. Additionally, plaintiff claimed that to prepare adequately for the charges against her,

she and her counsel needed to review the patient records on which her termination was primarily based.

Unable to reach an acceptable agreement, plaintiff sought injunctive relief. The trial court denied certain of plaintiff's requests for injunctive relief, but held that plaintiff was entitled to the representation of counsel at the internal review of her dismissal. *Hernandez v. Overlook Hosp.*, 291 *N.J.Super.* 462, 677 *A.*2d 811 (Ch.Div.1995). The trial court directed that plaintiff's counsel be permitted to participate in the termination proceedings, offer evidence on plaintiff's behalf, explain adverse data, and present arguments to the Board. The court also allowed the proceedings to be transcribed. The Appellate Division affirmed.

An employee appeals hearing was held on August 23, 1995. Pursuant to the trial court's order, plaintiff and defendant were represented by counsel and the proceedings were transcribed by a shorthand reporter. A final decision to terminate plaintiff has been rendered by the Board. At oral argument, both parties agreed that the hearing was satisfactory and in full compliance with the trial court's order.

## II

We first address defendant's argument that the decisions below should be reversed because they ignore the principles of "exhaustion of remedies." The doctrine of exhaustion of remedies requires that parties pursue available internal proceedings to conclusion before seeking judicial intervention. *Garrow v. Elizabeth Gen. Hosp. & Dispensary*, 79 *N.J.* 549, 559, 401 *A.*2d 533 (1979). That policy discourages premature judicial intervention in administrative proceedings. As in *Garrow,* we do not find any "crucial need which would justify judicial intervention" or that plaintiff's "claim to ... counsel rise[s] to such level as to warrant interlocutory judicial interference" in this matter. *Id.* at 562, 401 *A.*2d 533. Because the parties have briefed and argued the issues, and the issues are recurring, we will proceed to discuss the nature and

extent of procedural rights available to a terminated medical resident during an internal review of her academic termination.

### III

■ Although our courts have addressed the procedural protections owed to fully-licensed practitioners when denied staff appointments or privileges, *Garrow, supra*, 79 *N.J.* 549, 401 *A.*2d 533 (1979); *Zoneraich v. Overlook Hosp.*, 212 *N.J.Super.* 83, 514 *A.*2d 53 (App.Div.), *certif. denied*, 107 *N.J.* 32, 526 *A.*2d 126 (1986), this case involves issues of a different dimension.

Residents, unlike licensed physicians, are generally considered students subject to the academic requirements of a residency program. *See, e.g., Mohammed v. Mathog*, 635 *F.Supp.* 748, 751 (E.D.Mich.1986) ("[a]s a resident, plaintiff was undeniably a student, subject to the academic requirements of the ... program"); *Samper v. University of Rochester*, 139 *Misc.*2d 580, 528 *N.Y.S.2d* 958, 961 (N.Y.Sup.Ct.1987) ("[T]he residency program was both a job and an educational prerequisite to the career goals of the plaintiffs"). While staff members are licensed and accredited physicians, plaintiff held only a temporary permit, allowing her to practice medicine on an extremely limited basis.

Last term, we faced similar issues in *In re University of Medicine & Dentistry*, 144 *N.J.* 511, 677 *A.*2d 721 (1996). In that case, we interpreted the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –29 (the Act), as it related to the University of Medicine and Dentistry of New Jersey's (UMDNJ) right to academic freedom. The principal issue in that case was "whether UMDNJ, a public employer, violated the Act when it refused to allow an intern's union representative to be present at an investigatory interview concerning the extent of discipline to be imposed on that intern for his alleged incompetence." *Id.* at 515, 677 *A.*2d 721. We were also called on to decide whether UMDNJ's refusal to provide the union with notice and pertinent information regarding the disciplinary action violated the Act. *Ibid.*

We began our analysis by finding that the intern was a "public employee" for the purposes of the Act and that the Act provided New Jersey public employees with the same right to have union representation at disciplinary investigations (*"Weingarten* right") as contemplated by the Federal National Labor Relations Act (NLRA). *Id.* at 529–30, 677 *A.*2d 721 (citing *NLRB v. J. Weingarten Inc.,* 420 *U.S.* 251, 95 *S.Ct.* 959, 43 *L.Ed.*2d 171 (1975)). The next step, however, was to decide whether the *Weingarten* right was limited by the public policy of academic freedom or contractually waived by a collective negotiating agreement entered into between UMDNJ and the union. *Id.* at 530, 677 A.2d 721.

Although we observed that the Act, under most circumstances, required UMDNJ to provide the union with notice and information when initiating disciplinary actions against employees, we recognized that "this case involve[d] a university teaching hospital deciding to terminate a student/employee for his alleged inability to treat patients in accordance with medical standards. That situation triggers a concern for academic freedom that might temper the rights provided in the Act." *Id.* at 532, 677 A.2d 721.

We found that the union was not entitled to interfere with UMDNJ's academic and medical decisionmaking process and that UMDNJ had the right "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 533, 677 A.2d 721 (quoting *Sweezy v. New Hampshire,* 354 *U.S.* 234, 263, 77 *S.Ct.* 1203, 1217, 1 *L.Ed.*2d 1311, 1332 (1957) (Frankfurter, J., concurring)). We summarized the concept of "academic freedom" that Justice Frankfurter contemplated in *Sweezy, supra,* 354 *U.S.* at 234, 77 *S.Ct.* at 1217, 1 *L. Ed.*2d at 1332, in the following manner:

> The concept of academic freedom that the university invokes in support of its claim of privilege is not unfamiliar to the judiciary. The public interest in promoting higher education reflects the view that 'it performs an essential social function' by promoting 'the pursuit of truth, the discovery of new knowledge through scholarship and research, teaching and general development of students, and the transmission of knowledge and learning to society at large.' As a result of this interest, courts have developed a concept of '[a]cademic freedom, [which] though not a

specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment.'

[*Dixon v. Rutgers, The State Univ.*, 110 *N.J.* 432, 448, 541 *A.*2d 1046 (1988) (citations omitted).]

*Accord Snitow v. Rutgers Univ.*, 103 *N.J.* 116, 121–22, 510 *A.*2d 1118 (1986).

In *In re University of Medicine & Dentistry, supra,* we found that the union had "the right to notice and information about pending discipline so that it may decide ... that the discipline does indeed involve an academic or medical judgment." *Id.* at 536, 677 A.2d 721. We therefore held that interns were entitled to union representation at termination hearings pursuant to *Weingarten. Ibid.* We emphasized, however, that a union representative is not to act

as an adversarial advocate in a proceeding; instead the union representative is simply there to consult with the intern, to explain the proceedings and provide a sympathetic ear during the hearing. However, while the intern is entitled to those rights, those rights end as soon as it is clear that the matter involves a truly academic or medical judgment. At that point the University's interest in academic freedom predominates over the rights guaranteed by the Act, and the union representative should leave the hearing and expect to receive no further information.

[*Ibid.*]

In this case, the decision to terminate plaintiff was based solely on her academic performance. The circumstances surrounding plaintiff's termination arose entirely out of her status as a medical student participating in an academic residency program that was designed to teach plaintiff the skills necessary to become a fully-licensed physician. Thus, Overlook's dismissal of plaintiff was indistinguishable from any other institutional decision to pass or fail a student for failure to meet academic requirements.

In a case based on very similar facts, the Minnesota Court of Appeals reached a similar conclusion. *Ross v. University of Minnesota,* 439 *N.W.*2d 28 (1989). In *Ross,* a resident was dismissed from the University of Minnesota's psychiatric residency program. 439 *N.W.*2d at 31. The resident claimed, *inter alia,* denial of substantive and procedural due process rights. *Ibid.*

For the purpose of reviewing the University's decision to terminate the resident for academic reasons, the court found that the resident was a student, not an employee, of the University. *Id.* at 33. The court's finding was based on the fact that the gravamen of the resident's complaint "arose in the academic arena and must therefore be considered an academic problem concerning a student." *Ibid.*

As such, the University's dismissal was viewed as a pass or fail decision based on the student's ability to meet curriculum standards. *Ibid.* In consideration of the academic context of the decision, the court deferred to the University's expertise in the academic area. *Ibid.*

Assessing a student's academic performance must be left to the sound judgment of the individual academic institution. *See In re University of Med. & Dent., supra,* 144 *N.J.* at 536, 677 *A.*2d 721. The process of rendering an academic decision frequently involves a subjective assessment of a student's ability to meet curriculum standards. Those evaluations should be conducted in an academic, rather than a legal, environment because such decisions do not lend themselves to the traditional fact-finding process of civil litigation.

## IV

We briefly comment on the cases relied upon by the trial court to support its finding that residents have a right to counsel at termination proceedings. Despite the trial court's findings, the cited authorities do not stand for the proposition that residents are entitled to an adversarial type of hearing prior to dismissal, but rather all that is required is a "fair procedure." Those cases place the responsibility on the institution to devise a system that provides the resident with adequate notice of the charges and a reasonable opportunity to be heard; formal proceedings involving trial-like procedures are not, however, required. *See, e.g., Mauriello v. University of Med. & Dent.,* 781 *F.*2d 46, 52 (3d Cir.), *cert. denied,* 479 *U.S.* 818, 107 *S.Ct.* 80, 93 *L.Ed.*2d 35 (1986) (holding

resident not entitled to full adversary hearing, but requiring notice of deficiencies, opportunity to examine evidence, and opportunity to be heard); *Stretten v. Wadsworth Veterans Hosp.*, 537 *F.*2d 361, 369 (9th Cir.1976) (same); *Ezekial v. Winkley*, 20 *Cal.*3d 267, 142 *Cal.Rptr.* 418, 572 *P.*2d 32, 39 (1977) (refraining from requiring "formal proceedings" or "rigid procedure[s]").

The other staff-privileges cases, primarily relied on by plaintiff in support of the right to counsel and discovery, recognize that those rights are founded upon the concept of "fundamental fairness," arising out of a licensed physician's dependence on staff privileges to earn a living and not based on a constitutional right to due process of law. *Garrow, supra,* 79 *N.J.* at 566–68, 401 *A.*2d 533; *Zoneraich, supra,* 212 *N.J.Super.* at 91, 514 *A.*2d 53. Those cases do not, however, apply to the termination of a resident from a private hospital program for academic reasons, but rather concern the denial of staff membership or privileges to fully-licensed physicians.

In *Garrow, supra,* we addressed the right of a surgeon or physician to counsel and discovery at an internal hearing concerning a non-profit hospital's denial of the physician's staff appointment. 79 *N.J.* at 549, 401 A.2d 533. We found that, although constitutional due process was unavailable in the absence of a showing that the hospital's action constituted state action, principles of "fundamental fairness" required that the hospital inform the physician of the specific charges and afford the applicant the opportunity to appear and present evidence on his or her own behalf. *Id.* at 564–65, 401 A.2d 533.

We also addressed an applicant-physician's right to counsel during the hearing. *Id.* at 566, 401 A.2d 533. Although we recognized the potential hazards in allowing the presence of counsel at such hearings, we held, "[i]n view of the physician's substantial interest in proceedings of this nature, ... the physician should have the right to have counsel present at mandated hospital hearings with respect to his [or her] application for admission to the staff." *Ibid.* (citations omitted).

In 1986, the Appellate Division revisited *Garrow* in an appeal regarding a licensed physician's action against Overlook Hospital for termination of her staff privileges. Relying on *Garrow,* the Appellate Division held that "a physician is entitled to fundamentally fair procedures in a non-profit hospital's consideration of staff membership." *Zoneraich, supra,* 212 *N.J.Super.* at 91, 514 *A.*2d 53. The panel, in compliance with *Garrow,* further held that notice must be given by the hospital of any charges or proposed action before the hearing and a qualified right to have counsel present and engage in discovery of relevant materials exists. *Id.* at 91, 514 *A.*2d 53.

Those cases, however, are clearly distinguishable from the instant case because they did not concern academic judgment. Here, plaintiff's dismissal from the Internal Medicine Residency Program at Overlook Hospital only involved issues of academic and medical judgment. The relief sought by plaintiff and granted by the courts below would diminish the Program Director's ability to exercise academic judgment and deny the Appeal Board the opportunity to apply the procedures that it deems necessary to attain appropriate levels of performance from its residents. As such, Overlook's interest in academic freedom predominates because the relief sought by plaintiff will result in an "appreciable interference" with the Appeal Board's academic judgment. *Cf. In re University of Med. & Dent.,* 144 *N.J.* at 534, 677 *A.*2d 721.

A graduate or professional school is, after all, the best judge of its students' academic performance and their ability to master the required curriculum. The presence of attorneys or the imposition of rigid [procedural] rules ... would serve no useful purpose, notwithstanding that the dismissal in question may be of permanent duration.

[*Board of Curators of the Univ. of Mo. v. Horowitz,* 435 *U.S.* 78, 85 n. 2, 98 *S.Ct.* 948, 953 n. 2, 55 *L.Ed.*2d 124, 132 n. 2 (1978) (quoting *Greenhill v. Bailey,* 519 *F.*2d 5 (8th Cir.1975)).]

## V

If academic termination hearings are transformed into legal proceedings that involve legal procedures, the academic hearing would become an adversarial and litigious contest. The panel of

doctors would no longer be acting as academics reviewing medical decisions, but rather as judges, ruling on legal issues that they are not trained or qualified to evaluate. The procedure would become complicated, legalistic, and time consuming and expeditious review of academic judgments would be severely hindered.

In addition, candid input and evaluations from attending physicians and senior residents regarding the residents' academic performance could be discouraged, raising a concern that residents may escape critical review of poor academic and practical performance. Those evaluations ensure that residents are performing at acceptable levels of competency and professionalism. Without such input, the integrity of the program and the public interest is at stake.

As Justice O'Hern recognized in his concurrence in *Dixon v. Rutgers, The State Univ.*, 110 *N.J.* 432, 541 *A.*2d 1046 (1988):

> What we must avoid at all costs is the pursuit of mediocrity that can result from judicially supervised academic decisions. Tenure and promotion processes invariably involve the most solemn educational actions of a university. *Snitow v. Rutgers Univ.*, 103 *N.J.* 116, 123, 510 *A.*2d 1118 (1986). Courts that recognize the qualified academic privilege 'seek to foster frank and candid evaluation of candidates by their colleagues during hiring and tenure review committee deliberations.' R. Allen & C. Hazelwood, *'Preserving the Confidentiality of Internal Corporate Investigations,'* 12 *J. Corp. L.* 355, 362 n. 63 (1987). What they seek to avoid are the vapid generalities and euphemisms that supplant 'telling it like it is.'
>
> [*Id.* at 463, 541 *A.*2d 1046.]

There may, however, be situations in which the employer's interest in academic freedom is outweighed by other considerations such as claims that the termination was motivated by reasons which violated the resident's Civil Rights. In such cases, the right to counsel at a resident's termination proceeding would be appropriate to vindicate those substantive rights and protect the public from discriminatory hiring and termination practices. This case, however, does not raise such concerns, as plaintiff has failed to demonstrate that the dismissal was motivated by bad faith or ill-will unrelated to academic performance.

We also recognize that the Accreditation Council for Graduate Medical Education's current requirements for resident's contracts

includes procedures providing for the opportunity of counsel in the event of a resident's termination. Those guidelines, however, are intended only to provide "advice" to institutions providing residency training, to resident organizations, and to individual residents; they are not mandatory. Furthermore, the record is devoid of any evidence indicating that Overlook adopted those guidelines or made any representations to plaintiff that the guidelines controlled in the event of an academic termination.

Because of plaintiff's unique status as a doctor-in-training and considering the strong public policy of ensuring that only qualified physicians serve the public, we find that Overlook is qualified, both substantively and procedurally, to pass judgment on whether plaintiff is fit to practice medicine in its programs. To hold otherwise and not afford great deference to a Program's expertise in this area would, in effect, threaten the autonomy of such a programs to determine the academic standards by which residents are to be educated, trained, and judged.

■ Nevertheless, residents, like plaintiff, have an interest in acquiring a medical license, other licensed residents have an interest in becoming board certified in their specialty. All residents have an interest in earning income, and preserving their professional reputations. Those institutions must, therefore, guarantee an academically terminated resident a "fair procedure." Such "fair procedure" includes the right to adequate notice of deficiencies, an opportunity to examine the evidence of those deficiencies used by the hospital to make its academic decision, and the right to present a case to the decision-making authority. As in *In re University of Medicine and Dentistry, supra*, 144 *N.J.* at 535, 677 *A.*2d 721, a resident also may bring a peer or other physician, including a professor to the hearing. Such a person could consult with the resident and provide a sympathetic ear during the hearings. However, such a person could not act as an adversarial advocate. Those mandates not only accord great weight to the institution's judgment as to a resident's competence,

but also ensure that all of the relevant evidence is considered and protect against the risk of arbitrary or capricious decisionmaking.

## VI

Finally, the record clearly indicates that plaintiff was fully aware of Overlook's dissatisfaction with her academic performance and was afforded sufficient notice and an opportunity to be heard. Although we pass no judgment on whether plaintiff's dismissal was warranted, we are satisfied that the decision to dismiss plaintiff was carefully and deliberately rendered.

The judgment of the Appellate Division is *reversed.*

POLLOCK, J., dissenting.

The majority acknowledges that in a proceeding to terminate a medical resident from a residency for academic reasons a private hospital must provide the resident with a fair procedure. *Ante* at 81–82, 692 *A.*2d at 977. According to the majority, the resident's right to a fair hearing includes the right to representation by a union representative, a peer, another physician, or a professor. *Ante* at 76–82, 692 *A.*2d at 974–977. Contrary to the rulings of the lower courts, however, the majority denies the resident the right to representation by counsel. I respectfully dissent.

In my opinion, it is fundamentally unfair to deny a medical resident the right to counsel at a proceeding to terminate his or her residency. Consistent with that conclusion, the Chancery Division held "that a resident terminated from a private hospital's residency program has the right to have counsel attend and introduce evidence at a hospital hearing concerning the resident's termination." 291 *N.J.Super.* 462, 473, 677 *A.*2d 811 (1995). The Chancery Division further held that Dr. Hernandez had the right at her expense for a court reporter to record the hearing. *Id.* at 477, 677 *A.*2d 811. The Appellate Division affirmed both holdings. 293 *N.J.Super.* 260, 680 *A.*2d 765 (1996).

In denying Dr. Hernandez the right to counsel, the majority emphasizes that Overlook Hospital's decision to terminate her residency involves only academic freedom. The majority also emphasizes that the presence of a lawyer would unduly complicate the conduct of the hearing. I disagree with both characterizations.

Admittedly, a residency is a critical part of a doctor's training. A residency, however, differs significantly from the education that a medical student receives in medical school. In the first two years of medical school, students generally attend lectures as they would in other graduate schools. During the last two years, the training is more clinical. Following graduation, the ensuing residency is often described as "post-graduate training." Dr. Hernandez was a medical school graduate to whom The New Jersey State Board of Medical Examiners had issued a residency training permit.

As critical as a residency is to the training of a doctor, it is not solely an academic exercise. Residents also care for patients. Often they are the doctors present in the hospital during evening hours, on weekends, and on holidays. In many hospitals, they respond to patient emergencies such as cardiac arrest, arrhythmia, and bleeding. On patients' charts, residents sometimes change medication, make adjustments in intervenous fluids, and enter other orders affecting patient care. Although these entries are subject to review by an attending physician, the review often occurs after the fact.

The majority points out that as a resident Dr. Hernandez "could not admit or discharge patients, and could not prescribe drugs for out-patients without the signature of a licensed physician." *Ante* at 71, 692 *A*.2d at 972. Missing from that description is any acknowledgment of the acts that Dr. Hernandez could perform. According to the Board of Medical Examiner's letter that accompanied Dr. Hernandez's permit, counter-signatures were not required for "[p]rescriptions and orders written by a permit holder

in the in-patient setting." As a resident, Dr. Hernandez supervised interns, cared for patients, and made diagnoses.

To a patient or visitor at a hospital, a resident in his or her white coat is indistinguishable from any other physician. In sum, a resident is more than just a medical student. A resident in a modern hospital is an integral part of the health-care team.

Overlook Hospital valued Dr. Hernandez's services sufficiently to agree to pay her $35,000.00 per year, grant her four weeks vacation, and provide her with professional liability and life insurance. To characterize the termination of her residency as involving only academic freedom is to distort reality.

As the Chancery Division explained:

> [T]he effect of a resident's termination from a residency program [is] substantially similar to that of a physician being terminated from hospital staff. In both cases the resident as well as the physician have tarnished records affecting their professional reputations. Such a termination would indeed adversely impact on the likelihood of the resident being accepted into another residency program. This result would prejudice the resident's right to become licensed, board certified and practice in his or her area of specialty. Similarly, the prejudicial information on the physician's record may result in his or her denial of medical staff appointment at other hospitals. Having found that the effect and stigma of a resident being terminated from a residency program is substantially the same as a physician being terminated from hospital staff, it follows that a resident should be granted the same fundamental fairness at a hospital hearing as is afforded a physician in a termination proceeding.
>
> [291 *N.J.Super.* at 473–74, 677 *A.*2d 811.]

Licensed physicians possess the right to counsel at hearings to terminate their hospital privileges. *Garrow v. Elizabeth Gen. Hosp. & Dispensary,* 79 *N.J.* 549, 566, 401 *A.*2d 533 (1979); *Zoneraich v. Overlook Hosp.,* 212 *N.J.Super.* 83, 91, 514 *A.*2d 53 (App.Div.), *certif. denied,* 107 *N.J.* 32, 526 *A.*2d 126 (1986). The critical question here is not whether a residency is purely academic, but whether the academic aspect of a residency so outweighs all other considerations that the judiciary should deprive a medical resident of the right to counsel at a hearing to terminate her residency.

The majority accepts the premise that a staff physician enjoys the right to counsel at a hearing to terminate his or her privileges. It fears, however, that by according the same right to a resident, "[t]he procedure would become complicated, legalistic, and time consuming and expeditious review of academic judgments would be severely hindered." *Ante* at 80, 692 *A.*2d at 976. Those fears are exaggerated.

The presence of counsel to review records, advise the resident, and to present evidence need not unduly protract a proceeding to terminate a resident. In the present case, for example, the record reveals counsel's presence did nothing to confirm the majority's fears. Dr. Hernandez's lawyer presented no witnesses and did not cross-examine the hospital's witnesses. His presence, however, assured her that the proceeding was fair, an assurance that takes on added importance in view of the Hospital's ultimate decision to terminate her residency.

The majority itself harbors misgivings about its result. Without explanation, it recognizes that a resident would be entitled to a right to counsel if the resident's termination were "motivated by reasons which violated the resident's Civil Rights. In such cases, the right to counsel at a resident's termination proceeding would be appropriate to vindicate those substantive rights and protect the public from discriminatory hiring and termination practices." *Ante* at 81, 692 *A.*2d at 977. Likewise, a resident would be entitled to counsel if "the dismissal was motivated by bad faith or ill-will unrelated to academic performance." *Ibid.* I agree with those conclusions, but fail to see how the presence of counsel at a proceeding to terminate a residency for such reasons would be any less time-consuming or complicated than a termination proceeding based on the resident's performance. For some people, the right to work or to continue in a profession is as important as a civil right.

The Accreditation Council for Graduate Medical Education of the American Medical Association has reached a similar conclusion. It recommends that the *Guidelines for Resident Agreement*

*or Contracts* should provide for grievance procedures that include "the right of the resident to counsel." If the medical profession recognizes that residents are entitled to counsel at termination proceedings, it ill behooves the highest court of this State to reach a contrary conclusion.

The majority's calculus does not reveal any appreciation for the inequality of the contest between a hospital and a resident. The hospital has virtually limitless resources—including administrators, physicians, and lawyers—at its disposal. The resident stands alone. Many residents are burdened with debt and other obligations. Their status in relationship to the hospital is one of dependence, of an inferior to a superior authority.

Traditionally, courts try to assure a level playing field for contestants in administrative and judicial proceedings. Here, however, the majority is content to ignore the inequality between the hospital and the resident. To achieve this untoward result, the majority relies on exaggerated notions of academic freedom and misplaced fears about the conduct of lawyers in such proceedings.

I would affirm the judgment of the Appellate Division.

Justices HANDLER and STEIN join in this opinion.

*For reversal*—Chief Justice PORITZ, and Justices O'HEARN, GARIBALDI and COLEMAN—4.

*For affirmance*—Justices HANDLER, POLLOCK and STEIN—3.