677 A.2d 721

IN THE MATTER OF UNIVERSITY OF MEDICINE AND DENTIST-
RY OF NEW JERSEY, (SCHOOL OF OSTEOPATHIC MEDI-
CINE), RESPONDENT–APPELLANT, AND COMMITTEE OF
INTERNS AND RESIDENTS, CHARGING PARTY–RESPON-
DENT.

Argued March 26, 1996—Decided June 19, 1996.

512

*Katherine L. Suga,* Deputy Attorney General, argued the cause for appellant (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Barbara A. Harned,* Deputy Attorney General, on the brief).

*Carol G. Dunham,* argued the cause for respondent (*Reitman Parsonnet,* attorneys; *William J. Volonte, Carol G. Dunham, Bennet D. Zurofsky,* on the brief).

*Robert E. Anderson,* General Counsel, argued the cause for respondent New Jersey Public Employment Relations Commission.

The opinion of the Court was delivered by

GARIBALDI, J.

In this appeal, we consider the interrelationship between the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –29, and the University of Medicine and Dentistry of New Jersey's (UMDNJ) right to academic freedom. Specifically, we must determine whether UMDNJ, a public employer, violated the Act when it refused to allow an intern's union representative to be present at an investigatory interview concerning the extent of discipline to be imposed on that intern for his alleged incompetence. A second issue is whether UMDNJ violated the Act when it refused to provide the intern's union representative with notice and information regarding the disciplinary action.

I

UMDNJ was created for the purpose of "establish[ing] and operat[ing] programs of medical, dental, nursing, health related professions and health sciences education...." *N.J.S.A.* 18A:64G–2. The University is comprised of several schools, one of which is the School of Osteopathic Medicine (SOM). UMDNJ

operates internship and residency programs at its medical schools, including the School of Osteopathic Medicine. Interns and residents working for UMDNJ are unionized. The Committee on Interns and Residents (CIR) is the union recognized as the majority representative that acts on behalf of interns and residents.

In New Jersey, every student who completes medical school and wishes to be licensed as a physician must complete a year of postgraduate training known as an internship. *N.J.S.A.* 45:9–8(3). At the conclusion of the internship, the intern's employer files an evaluation of that intern's performance with the State medical-licensing board, which determines whether to license the doctor to practice medicine. UMDNJ's internship program requires interns to work each month in a different practice area under the guidance of a different faculty member/doctor. The job responsibilities of interns include working with patients, attending lectures, completing various assignments, and teaching medical school students. They are graded on their performance each month, and they also may receive oral evaluations from the faculty member to whom they are assigned. Interns at UMDNJ earn at least $32,000 annually for their work. UMDNJ's School of Osteopathic Medicine operates an internship and residency training program for graduates of osteopathic medical schools at Kennedy Memorial Hospital and the University Medical Center.

## A

In 1989, CIR and UMDNJ entered into a collective negotiating agreement (CNA) governing certain aspects of the terms and conditions of employment of interns and residents (collectively known as Housestaff Officers). In particular, the contract provides a mechanism to resolve disputes, or "grievances." The CNA defines "grievance" as an allegation that there has been

1. A breach, misinterpretation or improper application of the terms of this Agreement; or

2. An improper or discriminatory application of, or failure to act pursuant to, the written rules, policies or regulations of the University or statutes to the extent that

any of the above established terms and conditions of employment which are matters which intimately and directly affect the work and welfare of Housestaff Officers and which do not significantly interfere with inherent management prerogatives pertaining to the determination of public policy.

[CNA, Article XIII]

The CNA provides for several different types of grievance resolution. In particular, the parties may agree to seek an informal resolution and avoid a formal adjudication of every allegation. Therefore, the CNA provides for an informal discussion between the aggrieved intern and the Chief Resident or other hospital designee. "The grievant may, at his or her option, request the presence of a mutually agreed upon CIR representative during attempts at informal resolution." *Ibid.* Those unhappy with an informal resolution are permitted under the agreement to pursue a more formal process culminating in arbitration. Article XIII of the CNA provides that, during this formal process, "[t]he Program Director or designee shall meet with the grievant and a representative of the ... CIR for the purpose of discussing the grievance."

Article XIII of the CNA does, however, impose one important limit on this complaint procedure. "In no event shall matters concerning academic or medical judgment be the subject of a grievance under the provisions of this Article." Thus, no intern or resident may grieve any decision that is based on academic or medical judgment.

While Article XIII of the CNA does not allow complaints about actions based on medical judgment, Article XIV of the CNA discusses "disciplinary action" and provides:

Housestaff Officers may be disciplined or discharged for cause, however, *these actions shall be grievable* ....

The University shall give five (5) working days advance notice, in writing, of any intended disciplinary action to the affected Housestaff Officer and the CIR. The notice shall state the nature and extent of discipline, the specific charges against the Housestaff Officer and describe the circumstances upon which each charge is based.

[ (emphasis added) ]

However, the CNA is not the only document governing the relationship between UMDNJ and its interns. UMDNJ also supplies its interns with an Internship Manual that provides additional rules and regulations governing the interns' conduct. Article Nine in the Internship Manual provides for "Corrective Actions." The Internship Manual specifically states that that provision does not apply to "terms and conditions of employment," which are instead subject to the CNA.

Article Nine of the Internship Manual provides that

[w]henever an intern engages in, makes or exhibits acts, statements, demeanor or professional conduct, either within or outside of the medical center, and the same is or is reasonably likely to be detrimental to patient safety or to the delivery of quality patient care, disruptive to medical center operations or an impairment to the community's confidence in the medical center and/or its intern training program, corrective action against the intern may be initiated. . . .

The manual does not provide for notice to CIR in such an instance; nor does it contemplate any place for CIR in the entire disciplinary process.

When such a complaint is made, the dean or a designee is to conduct "an investigation." Such investigation "is not a 'hearing,' but may include a discussion with the person(s) initiating the request, and with other individuals who may have knowledge of the events involved." At the conclusion of that investigation, a written report is filed that may recommend no action, admonition, warning, probation, suspension or termination. The Internship Manual provides that "[a]ny recommendation for suspension or termination of internship entitles the intern to the procedural rights." However, the 'procedural rights' are not delineated.

If such a complaint is made, and the allegation requires immediate action "to protect the life of any patient or to reduce the substantial likelihood of injury or damage to the health or safety of any patient, employee, or other person," then the Internship Manual authorizes the administration to summarily suspend the intern. A summary suspension is effective immediately on imposition, and prompt notification must be provided to the intern.

## B

After graduating from medical school, Dr. Stephen Tenner began his internship for UMDNJ. Within the first two months of Tenner's internship, his supervisors began to perceive problems with his performance. Tenner was not working well with the nurses and was very indecisive in his medical judgment, constantly changing his mind about the course of treatment for patients. Several doctors reported those problems to Dr. George Charney, the chief medical officer of the hospital. He spoke to Tenner about those complaints on August 14, 1990. In October, Tenner wrote to Charney and asked for time off to concentrate on resolving various problems. Tenner was granted a paid leave of absence from October 22 to November 9.

Tenner's problems continued after he returned from leave. In early December, another doctor found his performance inadequate and counseled him regarding the problems he perceived. Tenner continued to show inadequate knowledge and to be indecisive in selecting courses of treatment.

Because the hospital worked with a skeletal crew during the week between Christmas and New Year's Day, the administration was afraid to allow Tenner to continue treating patients since there would be less supervision of his work. On December 21, 1990, Charney received yet another complaint and, acting pursuant to Article Nine of the Internship Manual, summarily suspended Tenner, finding him to present a threat to the safety of patients. In his letter to Tenner notifying him of the suspension, Charney wrote that the suspension was "based on continued acts, statements, professional conduct, and continued poor performance [that] is detrimental to the delivery of quality care and is likely to be detrimental to patient safety and has been disruptive to medical center operations." No notice was provided to CIR.

On the next day, the entire UMDNJ administration went on vacation and did not return until December 31. In the meantime, Tenner sought the help of Deborah Friedman, a CIR employee. She made several telephone calls to discover why the CNA was

not being followed. She asked for a formal statement of the charges, access to Tenner's personnel file, and Tenner's reinstatement pending a hearing.

Friedman received no response to her phone calls, so she sent a letter to Dr. Jay Yanoff, UMDNJ's internship director, requesting a meeting to discuss the situation. Yanoff spoke to her by telephone and explained that because this situation involved an "academic or medical judgment" pursuant to Article XIII, the CNA did not apply. Accordingly, there was no need for CIR's involvement in the case and CIR was not entitled to have access to UMDNJ's file on Tenner. He did state that Tenner himself could have access to his file, but there is a dispute about whether Tenner was actually given such access.

On January 2, 1991, Dr. Thomas Allen was selected to investigate this complaint, again pursuant to Article Nine of the Internship Manual. He asked several others to assist him. Friedman complained yet again that CIR had not been provided information about the charge; she also complained that CIR was not being allowed to participate in the hearings despite Tenner's request that a CIR representative attend. She complained that "[w]e cannot even begin to evaluate whether we agree with your characterization of this as a matter of academic and medical judgment precluding the filing of a grievance," because no information had been provided.

UMDNJ refused to allow CIR to participate in the investigation, still contending that UMDNJ had properly denied CIR a role in the Tenner investigation because the complaint related to Tenner's medical and academic activities, and, therefore, Article Nine of the Internship Manual, rather than Articles XIII and XIV of the CNA, was the governing standard. However, UMDNJ did allow Tenner to have another intern or a faculty member present in the investigation in order to assist him. Tenner declined that offer.

The committee recommended that Tenner be placed on probation for two months. Dr. Belsky, one of the committee members,

agreed to act as a mentor for Tenner and meet with him weekly to help Tenner improve his skills. Tenner successfully completed this probation on March 10, 1991, although Dr. Belsky was not entirely satisfied with Tenner's performance.

Shortly after Tenner completed probation, Dr. Charney received letters from six different doctors complaining about Tenner's performance. The complaints were not new: faulty medical judgment, failure to follow instructions, erroneous notes, and the giving of incorrect dosages of medication to patients. Charney attempted to meet Tenner to discuss those complaints, but Tenner refused to talk with him.

On April 10, 1991, Charney again summarily suspended Tenner. Once again, UMDNJ acted pursuant to Article Nine of the Internship Manual rather than Articles XIII and XIV of the CNA. Dr. Allen convened an investigation, but no notice was provided to CIR. Allen recommended that Tenner be terminated, and the Dean concurred and terminated his internship.

On July 16, 1991, CIR filed an unfair practice charge with the New Jersey Public Employment Relations Commission (PERC). The charge alleged that in forbidding CIR to represent Tenner at the two investigatory interviews and in withholding from CIR notice of and information pertaining to the disciplinary action taken against Tenner, UMDNJ violated certain provisions of the Act, *N.J.S.A.* 34:13A–5.4(a)(1) and (a)(5). Notably, CIR did not base the argument on any violation of the CNA, but rather on a claim that the Act itself, irrespective of contractual language, obligated UMDNJ to provide notice to CIR and allow it access to information and the hearing. CIR did not seek any remedy for Tenner, but rather sought a prospective order requiring UMDNJ to provide those statutory rights in the future.

PERC assigned the matter to a hearing examiner. At the hearing, UMDNJ stipulated that it was a "public employer" and that CIR was a "public employee representative." UMDNJ did not contest that Tenner was an employee, but rather argued that it was not obligated to provide notice, information, and access to

the hearing because CIR had waived those statutory rights in Article XIII. The PERC examiner agreed with UMDNJ, finding that the statutory right to participate in the hearing did not apply under the facts of this case, and that Article XIII waived all of those statutory rights. *UMDNJ (School of Osteopathic Medicine)*, 19 *NJPER* ¶ 24095, *rev'd*, 19 *NJPER* ¶ 24155 (PERC 1993).

PERC reversed, finding that the statutory rights did apply to Tenner's situation and that Article XIII was not a waiver of those rights. *UMDNJ (School of Osteopathic Medicine)*, 19 *NJPER* ¶ 24155 (1993). "Even if the union had agreed to limit an employee's right to pursue a substantive claim through a particular grievance procedure, that agreement would not constitute a clear waiver of an employee's procedural right...." *Id.* at 344. Consistent with CIR's limited request for relief, PERC did not order any remedy with respect to Tenner personally. Instead, PERC ordered UMDNJ to "Cease and Desist from ... denying [CIR] the right to represent employees at investigatory interviews ... [and] denying CIR information about disciplinary actions." *Ibid.*

UMDNJ then filed a motion for reconsideration that raised, for the first time, a claim that interns were not employees under labor law, but rather students and therefore deserve no statutory protection. UMDNJ also argued that Article XIII embodied its general right to academic freedom, and PERC's decision infringed on that right by allowing CIR to determine how UMDNJ operated its educational institution. PERC granted the motion for reconsideration. On reconsideration, PERC held that interns may be students but are also employees and therefore deserve protection under labor law. Furthermore, PERC found no infringement on academic freedom in its earlier decision and therefore affirmed it.

In an unpublished *per curiam* decision, the Appellate Division affirmed, substantially for the reasons set forth in PERC's opinion. We granted UMDNJ's petition for certification. 142 *N.J.* 573, 667 *A.*2d 191 (1995).

## II

■ Article 1, paragraph 19 of the New Jersey Constitution guarantees the right of public employees to organize and petition the government. To effectuate this right, the Legislature enacted the Employer–Employee Relations Act, *N.J.S.A.* 34A:1 to –29 (the Act), creating certain substantive rights on behalf of public employees, including the right to engage in collective bargaining and collective representation.

By definition, the Employer–Employees Relations Act applies only to employees. For the first time in its motion for reconsideration before PERC, UMDNJ asserted that interns, including Tenner, were not employees but were students. Therefore, because interns are not employees, they would not be covered by the Act.

This is a question of first impression in New Jersey, but many other jurisdictions have considered whether interns are employees or students. The National Labor Relations Board (NLRB) has rejected the claim that interns and residents are "employees" covered by the National Labor Relations Act (NLRA). *See Cedars–Sinai Medical Ctr.,* 223 *NLRB* 251 (Mar. 23, 1976). The NLRB concluded that "interns, residents, and clinical fellows are primarily engaged in graduate educational training ... and that their status is therefore that of students rather than of employees." *Id.* at 254. "Notwithstanding the NLRB line of cases, the vast majority of states addressing the question of housestaff bargaining rights have held that housestaff are employees within the meaning of their respective collective bargaining statutes...." Neil M. Gerster, *Medical Housestaff: Scholars or Working Stiffs? The Pending PERB Decision,* 12 *Pac. L.J.* 1127, 1133–34 (1981). *See, e.g., Regents of the Univ. of California v. Public Employment Relations Bd.,* 41 *Cal.*3d 601, 224 *Cal.Rptr.* 631, 715 *P.*2d 590 (1986); *Regents of the Univ. of Michigan v. Michigan Employment Relations Comm'n,* 389 *Mich.* 96, 204 *N.W.*2d 218 (1973); *House Officers Ass'n for the Univ. of Nebraska Medical Center & Affiliated Hosps. v. University of Nebraska Medical Ctr.,* 198

*Neb.* 697, 255 *N.W.2d* 258 (1977); *University Hosp., Univ. of Cincinnati College of Medicine v. State Employment Relations Bd.,* 63 *Ohio St.*3d 339, 587 *N.E.*2d 835 (1992). *But see Ross v. University of Minnesota,* 439 *N.W.*2d 28 (Minn.Ct.App.1989) (viewing resident as a student for purposes of reviewing termination from a residency program); *Philadelphia Ass'n of Interns & Residents v. Albert Einstein Medical Ctr.,* 470 *Pa.* 562, 369 *A.*2d 711 (1977) (following NLRB view).

Commentators have generally agreed with those states that have rejected *Cedars–Sinai* and have instead held that interns are employees for purpose of labor relations law. *See, e.g.,* Daniel W. Srsic, *Collective Bargaining by Physicians in the United States and Canada,* 15 *Comp. Lab. L.J.* 89, 105 (1993); Judith L. Maute, *Student–Workers or Working Students? A Fatal Question for Collective Bargaining of Hospital House Staff,* 38 *U. Pitt. L.Rev.* 762, 767–69, 772–73 (1977); Kathleen Drake, *Labor Problems of Interns and Residents: The Aftermath of Cedars–Sinai,* 11 *U.S.F. L.Rev.* 694, 702–05 (1977). *But see* Stephen L. Sepinuck, *Hospital Residents and Interns: Inconsistent Treatment under Federal Law,* 29 *St. Louis U.L.J.* 665 (1985) (noting "extensive criticism" of *Cedars–Sinai,* but concluding that case was correctly decided).

Both PERC and UMDNJ recognize that interns are not considered employees at all times and for all purposes, just as they are not considered students at all times and for all purposes. Interns have, in fact, a dual status. They work in patient care and are paid; on the other hand, they are obligated to attend lectures, are given grades, and must complete their program in order to be licensed as physicians. As PERC stated in its Decision and Order on Motion for Reconsideration, "[t]hose additional factors may create additional rights and responsibilities under other sources of authority, but they do not nullify the rights interns have as public employees under the Act."

As mentioned *supra* at 521, 677 *A.*2d at 726, UMDNJ stipulated at the PERC hearing that it is a "public employer," and that CIR is a "public employee representative within the [Act]," thus con-

ceding that interns and residents are "public employees" for the purposes of the Act. Moreover, UMDNJ had entered into a CBA with CIR concerning the work performance and pay of interns, and had paid Tenner more than $30,000 for his hospital work. UMDNJ never raised, until its motion for reconsideration, any argument that interns should not be recognized as employees under the Act. As PERC observed, when an employer contests rather than concedes that a worker is an "employee," PERC conducts a hearing on that fact-sensitive issue. *See, e.g., Somerset County College*, 13 *NJPER* ¶ 18150, at 363 (1987) (detailing evidence presented at such a hearing). Without having that issue raised below, without allowing CIR to develop a record contesting that assertion, and without having PERC assess the relevant evidence and arguments, UMDNJ's stipulation and its failure to raise this issue at the hearing preclude it from now challenging PERC's classification of Tenner as an employee. For purposes of this decision, we deem Tenner to be an employee.

## III

### A

*N.J.S.A.* 34:13A–5.4(a)(1) states:

Public employers, their representatives or agents are prohibited from:

(1) Interfering with, restraining or coercing employees in exercise of the rights guaranteed to them by this act.

CIR alleges that UMDNJ violated this provision by refusing to allow it to represent Tenner during the investigatory hearing.

Like New Jersey's Act, the NLRA provides that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 157 of this title." 29 *U.S.C.A.* § 158(a)(1). Section 157 guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 *U.S.C.A.* § 157.

In *NLRB v. J. Weingarten, Inc.*, 420 *U.S.* 251, 95 *S.Ct.* 959, 43 *L.Ed.*2d 171 (1975), the NLRB first announced the employee's right to have union representation at disciplinary investigations ("*Weingarten* right"). *Weingarten* involved a lunch-counter worker who had been accused of stealing food from her employer. When the store manager and a member of the store's security team questioned her, she requested the presence of her union representative at the interview, but those requests were denied. *Id.*, 420 *U.S.* at 254–55, 95 *S.Ct.* at 962–63, 43 *L.Ed.*2d at 176–77. The employee filed a claim with the NLRB arguing that the employer's actions had interfered with her rights, contrary to 29 *U.S.C.A.* § 158(a)(1).

The NLRB found that the employer's action in refusing to allow union representation violated the NLRA because it interfered with the right, codified in 29 *U.S.C.A.* § 157, of employees to act together for mutual benefit. The Supreme Court upheld this interpretation of the NLRA and defined the contours of that new right:

*First*, the right inheres in § 7's guarantee of the right of employees to act in concert for mutual aid and protection. . . .

*Second*, the right arises only in situations where the employee requests representation. . . .

*Third*, the employee's right to request representation as a condition of participation in an interview is limited to situations where the employee reasonably believes the investigation will result in disciplinary action. . . .

*Fourth*, exercise of the right may not interfere with legitimate employer prerogatives. . . .

*Fifth*, the employer has no duty to bargain with any union representative who may be permitted to attend the investigatory interview. . . . "The representative is present to assist the employee, and may attempt to clarify the facts or suggest other employees who may have knowledge of them. The employer, however, is free to insist that he is only interested, at that time, in hearing the employee's own account of the matter under investigation."

[*Weingarten, supra*, 420 *U.S.* at 256–260, 95 *S.Ct.* at 963–65, 43 *L.Ed.*2d at 177–79 (citation omitted) ]

In addition to relying on the language of the statute, the Court also discussed the policy justifications for the NLRB's conclusion. The Court noted that "[r]equiring a lone employee to attend an

investigatory interview which he reasonably believes may result in the imposition of discipline perpetuates the inequality the [National Labor Relations] Act was designed to eliminate, and bars recourse to the safeguards the Act provided 'to redress the perceived imbalance of economic power between labor and management.' " *Id.*, 420 *U.S.* at 262, 95 *S.Ct.* at 966, 43 *L.Ed.*2d at 180 (quoting *American Ship Building Co. v. NLRB*, 380 *U.S.* 300, 316, 85 *S.Ct.* 955, 966, 13 *L.Ed.*2d 855, 866 (1965)). The Court also defended the Board's ruling as being beneficial to employers as well as employees:

A single employee confronted by an employer investigating whether certain conduct deserves discipline may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating factors. A knowledgeable union representative could assist the employer by eliciting favorable facts, and save the employer production time by getting to the bottom of the incident occasioning the interview.

[*Id.*, 420 *U.S.* at 262–63,·95 *S.Ct.* at 966, 43 *L.Ed.*2d at 181.]

The NLRA does not apply to state employees, *see* 29 *U.S.C.A.* § 152(2), so the *Weingarten* decision provides no rights to CIR or Tenner. However, New Jersey's Act has a provision similar to Section 157, the root of the *Weingarten* right, granting public employees "the right, freely and without fear of penalty or reprisal, to form, join, and assist any employee organization." *N.J.S.A.* 34:13A–5.3. In *East Brunswick Board of Education*, 5 *NJPER* ¶ 10206 (1979), PERC adopted the *Weingarten* rule "[i]n view of the similarity between the unfair practice provisions of the National Labor Relations Act and those of the New Jersey Employer–Employee Relations Act, as amended...." *Id.* at 399. The New Jersey Act is indeed similar to the National Labor Relations Act (NLRA) in its 'description of what constitutes an unfair labor practice. *Galloway Tp. Bd. of Educ. v. Galloway Tp. Ass'n of Educ. Secretaries*, 78 *N.J.* 1, 9, 393 *A.*2d 207 (1978).

Neither party contests PERC's adoption of the *Weingarten* right as consistent with New Jersey's Act. The conclusion that the Act provides New Jersey public employees with the *Weingarten* right is consistent with the purposes behind the Act as described in *Red Bank Regional Education Ass'n v. Red Bank Regional*

*High School Board of Education,* 78 *N.J.* 122, 393 *A.*2d 267 (1978). In that case, this Court confronted the question whether a union has the right to file an organizational grievance instead of asking an individual employee to file a grievance in her own name. In concluding that unions indeed enjoy such a right under *N.J.S.A.* 34:13A–5.3, the Court noted that "[t]he principle of collectivity . . . in public employment labor relations is at the heart of the legislative scheme." *Red Bank Regional Ed. Ass'n, supra,* 78 *N.J.* at 138, 393 *A.*2d 267. The Court stated that to deny the union the sought-after right "would surely 'short-circuit' the system of collectivity the Legislature sought to promote in the Act and weaken its benefits." *Ibid.*

There are other policy justifications for granting New Jersey public employees the protection of the *Weingarten* rule. As one commentator has explained, an investigatory interview of an employee often entails an atmosphere of isolation and intimidation of the employee. *See* Anthony R. Baldwin, *Weingarten and the Taylor Law—A Claimed Difference Without Distinction,* 7 *Hofstra Lab. L.J.* 123, 127–29 (1989). In such a setting, employees may be less than articulate in attempting to defend themselves. Employees may not realize that they could exonerate themselves through recounting to the employer certain mitigating circumstances. Thus, an employee's defense may be less than compelling, squandering the last chance of exculpation before punishment is delivered. *See id.* at 130. Those concerns have prompted some to compare the *Weingarten* right accorded employees to the protections accorded the criminally accused. *See id.* at 139 (citing *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L. Ed.*2d 694 (1966)).

In view of the purposes behind the Act and the benefits of the *Weingarten* right, we find that PERC's identification of the *Weingarten* right within the Act is a permissible construction of the statute. We emphasize the broad discretion granted to PERC in construing the Act and the absence of legislative language or history contradicting PERC's conclusion. *In re Hunterdon Coun-*

*ty Bd. of Chosen Freeholders,* 116 *N.J.* 322, 328–29, 561 *A.*2d 597 (1989). We also observe this Court's willingness to be guided in its interpretation of the Act by the federal courts' "experiences and adjudications under the [NLRA]." *Galloway Tp. Bd. of Educ.,* *supra,* 78 *N.J.* at 9, 393 *A.*2d 207.

## B

 Tenner would have been entitled to the *Weingarten* right during the investigation only if he reasonably believed that disciplinary action might result. *See Weingarten, supra,* 420 *U.S.* at 252–53, 95 *S.Ct.* at 961–62, 43 *L.Ed.*2d at 175. The reasonable belief standard is guided by "objective standards under all the circumstances of the case." *Id.,* 420 *U.S.* at 257 n. 5, 95 *S.Ct.* at 964 n. 5, 43 *L.Ed.*2d at 178 n. 5 (quoting *Quality Mfg. Co.,* 195 *NLRB* 197, 198 n. 3 (1972)). If the decision to discipline the employee has already been made, then there is no right to union representation. Thus, in *John E. Runnels Hospital,* 11 *NJPER* ¶ 16064 (1985), PERC found no violation of *Weingarten* when the employer held a meeting simply to inform an employee of a prior decision to terminate—because the decision had already been reached, there could be no reasonable anticipation of discipline at the meeting.

 The hearing examiner decided that the *Weingarten* right was not triggered in this case because Tenner had already been summarily suspended before the investigation began, but PERC rejected that conclusion. We agree with PERC. As discussed *supra* at 518, 677 *A.*2d at 724, summary suspension as contemplated by the Internship Manual is an *ex parte* temporary measure, akin to a temporary restraining order, preventing the intern from working when the intern presents a danger to patient safety. The temporary order is then quickly followed by a hearing where UMDNJ decides whether to warn, suspend, or terminate the intern. Clearly, one attending such a hearing can reasonably anticipate disciplinary action to result. The mere fact that one has been temporarily restrained pending a hearing does not mean

that a permanent suspension or termination is not additional discipline.

Here, the *Weingarten* right is triggered because Tenner requested union representation at an investigatory interview that concerned the extent of discipline that was to be imposed on him. However, we must still consider whether the *Weingarten* right was waived contractually or is limited by the public policy of academic freedom.

## IV

CIR also contends that UMDNJ violated Tenner's rights under the Act by refusing to notify it of the pending disciplinary action and provide the union with information so it could determine how to exercise its right and duty to represent Tenner.

*N.J.S.A.* 34:13A–5.4(a)(5) prohibits employers from "refusing to negotiate in good faith with a majority representative concerning terms and conditions of employment of employees" in that union. PERC has interpreted that provision as stating that an employer's failure to provide its employees' union with information that the union needs to represent its members constitutes a refusal to negotiate in good faith. *See, e.g., New Jersey Transit Bus Operations, Inc.,* 15 *NJPER* ¶ 20150 (1989) (holding that employer must provide information about employee complaint to union to allow union to determine whether complaint was meritorious); *City of Atlantic City,* 15 *NJPER* ¶ 20003 (1988) (same); *New Jersey Office of Employee Relations,* 13 *NJPER* ¶ 18284 (1987) (same).

Accordingly, "[a]n employer must supply information if [there is] a probability that the information is potentially relevant and that it will be of use to the union in carrying out its statutory duties." *New Jersey Office of Employee Relations, supra,* 13 *NJPER* at 754 (finding that union had right to information about vacation policies and records in order to determine whether employee's complaint was merited and worthy of grievance). Thus, unions are entitled to " 'a broad range of potentially useful

information.'" *Ibid.* (quoting *Procter & Gamble Mfg. Co. v. NLRB,* 603 *F.*2d 1310, 1315 (8th Cir.1979)). PERC requires every public employer to provide its employees' union with the information that the union needs to evaluate the merits of an employee's complaint about employer conduct unless such information is "clearly irrelevant or confidential." *Ibid.*

■ PERC's interpretation of that provision of the Act, as with the *Weingarten* right, follows the interpretation of the NLRA by the federal courts. *Ibid.* (recognizing that PERC development of right to information "rel[ied] on federal precedent"). The NLRA states that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." 29 *U.S.C.A.* § 158(a)(5). That provision has been interpreted as requiring employers to provide relevant information to their employee's union. "There can be no question of the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Industrial Co.,* 385 *U.S.* 432, 435–36, 87 *S.Ct.* 565, 568, 17 *L.Ed.*2d 495, 499 (1967).

As with the *Weingarten* right, neither party challenges the correctness of PERC's application of the statute. Indeed, UMDNJ concedes in its petition for certification that, ordinarily, "[i]nformation regarding the discipline of employees may very well constitute information 'relevant to contract administration' which must be provided to the majority representative." Thus, no one disputes that UMDNJ is ordinarily required to provide notice and information to CIR when it initiates disciplinary action. However, as with the *Weingarten* right, UMDNJ argues that that right also was waived contractually by Article XIII in the CNA and preempted by the government policy in favor of academic freedom.

## V

If this appeal did not involve an academic teaching hospital, we could easily affirm PERC's decision. Once one agrees that the

intern is an employee and that the substantive rights advanced by PERC are correct applications of the Act, UMDNJ's conduct appears to violate those rules. However, this case involves a university teaching hospital deciding to terminate a student/employee for his alleged inability to treat patients in accordance with medical standards. That situation triggers a concern for academic freedom that might temper the rights provided in the Act.

UMDNJ points to the preamble to the CNA, which states that "[t]he parties recognize that it is the responsibility of the University to provide a quality educational program," as well as to Article XIII's limit on grievances related to academic decisions, and argues that these provisions indicate that CIR made a " 'clear and unmistakable waiver' " of the rights guaranteed by the Act. *Prudential Ins. Co. of America v. NLRB,* 661 *F.*2d 398, 401 (5th Cir.1981) (citation omitted). We decline to find that CIR waived Tenner's *Weingarten* and other substantive rights by entering into the CNA with UMDNJ.

First, we observe that PERC has held that the *Weingarten* right may not be waived in a collective bargaining agreement, because the right is a personal right belonging to each individual. *Camden County Vo–Tech,* 7 *NJPER* ¶ 12206, at 468 (1981). The PERC hearing examiner in this case urged PERC to reconsider its rule in view of *Prudential*'s interpretation of the NLRA, but PERC has not yet done so. *UMDNJ (School of Osteopathic Medicine), supra,* 19 *NJPER* at 205. *N.J.S.A.* 34:13A–5.2 states that PERC "shall make policy and establish rules and regulations concerning employer-employee relations in public employment ... and to implement fully all the provisions of this act." We are therefore reluctant to announce such a change until PERC first considers that issue. Even if we were to adopt the Fifth Circuit's holding in *Prudential,* it is questionable that Article XIII of the CNA actually constitutes a "clear and unmistakable" waiver, especially because of Article XIV's statement that disciplinary "actions shall be grievable." However, we find it unnecessary to consider

that issue in view of our disposition of UMDNJ's academic-freedom argument.

## VI

■ UMDNJ contends that its general right to academic freedom preempts the substantive rights provided by the Act, since those rights would infringe upon its ability "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. State of New Hampshire*, 354 *U.S.* 234, 263, 77 *S.Ct.* 1203, 1217, 1 *L.Ed.*2d 1311, 1332 (1957) (Frankfurter, J., concurring).

We have recently summarized the concept that Justice Frankfurter described:

> The concept of academic freedom that the university invokes in support of its claim of privilege is not unfamiliar to the judiciary. The public interest in promoting higher education reflects the view that "it performs an essential social function" by promoting "the pursuit of truth, the discovery of new knowledge through scholarship and research, teaching and general development of students, and the transmission of knowledge and learning to society at large." As a result of this interest, courts have developed a concept of "[a]cademic freedom, [which,] though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment."
>
> [*Dixon v. Rutgers, the State Univ.*, 110 *N.J.* 432, 448, 541 *A.*2d 1046 (1988) (citations omitted).]

*Accord Snitow v. Rutgers Univ.*, 103 *N.J.* 116, 121–22, 510 *A.*2d 1118 (1986).

■ Our cases have recognized that rights guaranteed by the Act will be preempted when they infringe on important educational policies. *See Board of Educ. v. Neptune Tp. Educ. Ass'n*, 144 *N.J.* 16, 24, 675 *A.*2d 611 (1996). Thus, in *Association of New Jersey State College Faculties, Inc. v. Dungan*, 64 *N.J.* 338, 316 *A.*2d 425 (1974), we allowed the Board of Higher Education to promulgate guidelines on granting tenure to teachers even though the Board had not consulted with the union as required by the Act. *Id.* at 353–56, 316 *A.*2d 425. In reaching our decision in *Dungan*, we cited with approval a recommendation that

> Collective bargaining in colleges and universities not extend to academic freedom and tenure and related faculty personnel manners, and that grievances involving issues of freedom and tenure be referred to academic procedures outside the collective bargaining process.
>
> [*Id.* at 355, 316 *A.*2d 425 (citation omitted).]

*See also Burlington County College Faculty Ass'n v. Board of Trustees, Burlington County College,* 64 *N.J.* 10, 311 *A.*2d 733 (1973) (holding that setting of college calendar implicated academic freedom and was therefore outside scope of Act); *cf. Bethlehem Tp. Bd. of Educ. v. Bethlehem Tp. Educ. Ass'n,* 91 *N.J.* 38, 46, 449 *A.*2d 1254 (1982) ("[M]atters which involve sensitive educational policy decisions, could not be the subject of mandatory negotiations, even in the absence of preempting legislation," but are instead left solely to management's discretion.). Similarly, the Michigan Supreme Court, while holding that interns are employees, recognized that "[s]ome conditions of employment may not be subject to collective bargaining because those particular facets of employment would interfere with" the university's autonomy. *Regents of Univ. of Michigan, supra,* 204 *N.W.*2d at 224; *cf. Ezekwo v. New York City Health & Hosp. Corp.,* 940 *F.*2d 775, 785 (2d Cir.) (recognizing that, even if residents are deemed to be employees guaranteed certain rights, hospital may remove residents who present threat to patient safety without following normal procedures ordinarily required pursuant to Due Process Clause of United States Constitution), *cert. denied,* 502 *U.S.* 1013, 112 *S.Ct.* 657, 116 *L.Ed.*2d 749 (1991).

To the extent that UMDNJ's actions do involve its assertion of its right to academic freedom, there is no doubt that the Employer–Employee Relations Act will not be permitted to frustrate that effort. We agree with UMDNJ that CIR should not be able to interfere with its academic and medical decisions.

However, UMDNJ's academic-freedom argument fails because the enforcement of Tenner's *Weingarten* right would not have resulted in any appreciable interference with UMDNJ's academic judgment. UMDNJ would not have been precluded from making an academic decision; CIR sought only to have a

union representative accompany Tenner to his two interviews. As PERC in its brief recognized, *Weingarten* "neither grants an employee a substantive right to avoid a discharge nor constricts the employer's substantive rights to decide who may be discharged." The issue is not whether UMDNJ properly discharged Tenner *after* its investigations, but whether during its investigations it properly gave Tenner procedural rights to representation, notice and information that CIR and Tenner were entitled to under the Act. The CIR representative serves only to observe, assist and clarify. The employer has no duty to bargain with the union representative at the investigatory interview and may insist that its only interest lies in hearing the employee's own account of the matter under investigation. *See Weingarten, supra,* 420 *U.S.* at 260, 95 *S.Ct.* at 966, 43 *L.Ed.*2d at 179. The employer runs the interview and may expel a representative who interferes with the questioning. *New Jersey Bell Telephone Co.,* 308 *NLRB* 277 (1992).

No academic decision of UMDNJ is being second-guessed. CIR is not asking the Court to review the decision to dismiss Tenner, but rather seeks review of UMDNJ's decision to deny Tenner the statutory right to have someone accompany him as he states his case.

If that union representative could have legally obstructed or hindered UMDNJ's decision regarding disciplinary action against Tenner, a persuasive academic-freedom argument could be made. We recognize that there may be situations that might arise in which an employer's interest in academic freedom outweighs its employee's right to particular collective action under a state's labor laws. For example, if the Act provided a union with the right to veto a university's dismissal of a professor, a court might properly refuse to enforce that provision on the ground that it is contrary to the university's First Amendment rights. However, UMDNJ has failed to explain how granting the *Weingarten* right to interns and residents would interfere with the university's

academic judgment. Any interference with UMDNJ's academic freedom in this case was minimal.

CIR also has the right to notice and information about pending discipline so that it may decide, without simply relying on unverified assertions by UMDNJ, that the discipline does indeed involve an academic or medical judgment. At the PERC hearing, UMDNJ asserted that discipline for dress code violations could constitute academic or medical judgment, because, in some sense, part of being a doctor is dressing the part. Understandably, interns and CIR might not agree with this characterization and should not be forced to rely on UMDNJ's assertions.

Instead, UMDNJ must notify CIR of any disciplinary actions and provide it with access to information about the case. Similarly, interns are entitled to union representation pursuant to *Weingarten*. We emphasize, as PERC and CIR conceded at oral argument, that *Weingarten* does not contemplate that the union representative act as an adversarial advocate in a proceeding; instead the union representative is simply there to consult with the intern, to explain the proceedings and provide a sympathetic ear during the hearing.

However, while the intern is entitled to those rights, those rights end as soon as it is clear that the matter involves a truly academic or medical judgment. At that point, the university's interest in academic freedom predominates over the rights guaranteed by the Act, and the union representative should leave the hearing and expect to receive no further information.

> A graduate or professional school is, after all, the best judge of its students' academic performance and their ability to master the required curriculum. The presence of attorneys or the imposition of rigid [procedural] rules ... would serve no useful purpose, notwithstanding that the dismissal in question may be of permanent duration.
>
> [*Board of Curators of Univ. of Missouri v. Horowitz*, 435 *U.S.* 78, 85 n. 2, 98 *S.Ct.* at 948, 953 n. 2, 55 *L.Ed.*2d 124, 132 n. 2 (quoting *Greenhill v. Bailey*, 519 *F.*2d 5 (8th Cir.1975)) ]

We recognize that this solution is an unwieldy one, since it relies upon the good faith of the union in recognizing academic matters

and ending its participation at that time. Because we accept CIR's representation that it is interested in UMDNJ's academic freedom and ability to train good doctors, we believe that it will not put its members' interests ahead of those interests. Its behavior in this case, including its decision to seek no relief for Tenner in recognition of the medical judgment behind his termination, confirm the good-faith nature of CIR's representation. If our assumption does not prove to be true, then we will be forced to consider whether to preempt the Act at an earlier stage in the disciplinary process.

## VII

In summary then, we affirm PERC and the Appellate Division's conclusion that UMDNJ committed an unfair practice in refusing to provide notice and information to CIR about Tenner's case and in refusing to allow CIR to attend the investigatory interviews. Because of UMDNJ's right to academic freedom, however, CIR's right to information and its ability to attend hearings is terminated as soon as it is clear, as in this case, that the disciplinary proceedings were initiated solely due to academic and medical concerns. CIR must be provided with enough information to make that decision; once it does, it has no further business in the process.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.