**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2779-18

IN THE MATTER OF JOSEPH
CONNORS, CAMDEN COUNTY,
DEPARTMENT OF
CORRECTIONS.

_____

Argued March 8, 2021 – Decided July 7, 2021

Before Judges Gooden Brown and DeAlmeida.

On appeal from the New Jersey Civil Service Commission, Docket No. 2016-912.

Jacqueline M. Vigilante argued the cause for appellant Joseph Connors (The Vigilante Law Firm, PC, attorneys; Jacqueline M. Vigilante and Kelly A. Hicks, on the briefs).

Howard L. Goldberg, First Assistant County Counsel, argued the cause for respondent Camden County Department of Corrections (Christopher A. Orlando, County Counsel, attorney; Howard L. Goldberg, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Civil Service Commission (Craig S. Keiser, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant Joseph Connors appeals from the January 18, 2019 final agency decision of the Civil Service Commission (Commission) upholding his thirty-day suspension from his position as a corrections lieutenant with the Camden County Department of Corrections (CCDOC). We affirm.

I.

The following facts are derived from the record. On November 9, 2014, Connors was a lieutenant and acting shift commander at the Camden County Correctional Facility. He was responsible for the operations of the facility. Eight corrections officers were assigned to search cells with Sergeant James Pierce as their supervisor. After the search, several inmates reported that their personal photographs had been defaced, some with the handwritten word "Carr." This appears to be a reference to Corrections Officer Alfred Carr, who was not one of the officers who participated in the search of the cells.

Corrections Officer King received some of the inmate complaints. He referred the complaints to Pierce, who interviewed the inmates and spoke with the officers who had participated in the search. Pierce informed Connors of the allegations. Pierce admitted that he failed to keep a log of which officers

searched which cells, contrary to established procedures. He also failed to ask the officers which cells they searched.

Together Connors and Pierce spoke again to the inmates and collected the defaced photographs. Connors then interviewed the officers involved in the search as a group. He informed them of the seriousness of the complaints and asked them to come forward with information about who defaced the photos. Connors and Pierce subsequently spoke to each of the officers individually. Corrections Officer Jacob reported that he witnessed King write on the photographs. Connors then spoke with King, who denied any involvement in the incident.

Connors instructed Pierce to prepare an incident report, directing him to make the report vague. After reviewing Pierce's report, Connors instructed him to submit it, along with the collected photographs, to the Internal Affairs (IA) mailbox.

Connors was unaware whether IA received the incident report or conducted an investigation. Although he claimed that he asked Sergeant Jones, an IA investigator, about the report in the days following the incident, Jones testified that he did not remember having had that conversation with Connors. No investigation was undertaken by IA.

A-2779-18

Carr learned of the incident on December 1, 2014, nearly a month after it took place. Fearing for his safety, he immediately submitted a report to IA about the incident. Jones testified that he did not receive Pierce's report until he received Carr's report. He obtained the original photographs from the warden.

Jones interviewed the inmates, who reported that they had had no previous problems with Carr and doubted he was involved in defacing their property. On December 11, 2014, Jones interviewed Pierce and King. King denied any involvement in the incident. He stated that shortly after the incident he approached Connors to discuss a conversation he had with Corrections Officer Bulzak, who he suspected was involved in defacing the photographs. According to King, Connors refused to discuss Bulzak, telling him the matter was out of his hands.[1]

On December 19, 2014, Jones interviewed Jacob. He stated that although he saw King write on the photographs, he never gave that information to Connors.

On December 30, 2014, Jones interviewed Connors. Prior to the start of the interview, Connors signed a witness acknowledgment form that provided

---

[1] Bulzak denied involvement in the incident and was not charged.

A-2779-18

notice that he was a witness in an IA investigation concerning a complaint by Carr. At the time of the interview, Connors was not a target of the investigation.

Connors admitted that on the day of the incident, he interviewed the officers involved in the search, but did not write a report documenting the fact that the interviews took place or detailing the information he gathered. In addition, Connors told Jones he felt he could not act on Jacob's accusation against King. He explained that:

> I took it into consideration and then I made a point again to speak to Officer King in my office . . . . And he went on a long rant about . . . his future intentions with the department at the time . . . . And at the time Officer King had no discipline that I knew of . . . . So . . . I had one guy, Jacob, who is up for promotion who had a lengthy . . . disciplinary history saying he's seen someone do something. And then I have an officer with a stern (sic) clean record . . . telling me he had nothing to do with it . . . . So I had two different weighing options . . . .

When asked why he did not prepare an initial incident report, Connors stated

> I didn't generate any reports because I didn't have any credible evidence. And I did not want to mislabel any officer, uh, for being, eh, juvenile or make their – their work atmosphere and the people they work with harder. Once you accuse someone until they have their day in court they're assumed guilty in – in a lot of people's eyes in the court of public opinion. And if you have to work with someone you think that is doing something

5

improper and we put the reports out there and everyone gets copies then no one's [going to want to] work with that individual.

Connors also admitted that Pierce's report was

vague intentionally because I didn't want to . . . automatically be branded with this title of, uh, rat or – a juvenile or – or a danger.  [A]t the time all I had was hearsay.  So the report was intentionally vague with the assumption that when I reported to work on my assigned day I would be interviewed first being[] that I was the Shift Commander of the jail for that incident.

After his interview, and almost two months after the incident, Connors filed a report that stated that "more than one officer had been lying" and that "more than one person had committed the act."

Based on the information gathered at the interviews, Jones determined that Connors had violated his duties by failing to conduct an appropriate investigation and to document the investigation he did undertake.  Jones determined that Connors should have: (1) had Jacobs write a report detailing what he claimed to have seen; (2) detailed his investigation in a written report; and (3) recommended disciplinary action be taken against King based on the information he received.  As a result of the findings he set forth in a written report, Jones filed a complaint recommending Connors be disciplined.

6

On February 5, 2015, CCDOC filed a preliminary notice of disciplinary action against Connors seeking a thirty-day suspension based on the following charges: conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); and other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12), specifically, violations of CCDOC's rules of conduct and general orders. After a departmental hearing, all charges were sustained, and CCDOC served Connors with a final notice of disciplinary action suspending him for thirty days.

Connors appealed his suspension to the Commission, which transmitted the matter to the Office of Administrative Law (OAL). After a hearing, Administrative Law Judge (ALJ) Elia A. Pelios issued an initial decision sustaining the charges. ALJ Pelios found, based on a preponderance of the evidence, that on the day of the incident Pierce made Connors aware of the inmates' complaints that their property had been defaced during the cell searches. In addition, the ALJ found that Jacob told Connors that he witnessed King defacing inmate property. The ALJ found that Connors failed to: (1) document the incident and Jacob's allegation; (2) complete the investigation; and (3) recommend disciplinary charges against King.

7 <span>A-2779-18</span>

The ALJ found that CCDOC had established each of the charges alleged. The ALJ found that Connors's conduct was unbecoming a public employee because he failed to initiate an appropriate investigation after receiving a report of serious misconduct by a subordinate. That failure, the ALJ concluded, could have an effect on the chain of command in the corrections facility, as employees may be chilled in coming forward with allegations of wrongdoing if they believe their reports of misconduct by coworkers will not be taken seriously.

In addition, the ALJ found that Connors neglected his duties because he violated established CCDOC rules requiring a supervisor to conduct proper, thorough, and complete investigations when circumstances so indicate, to submit reports detailing those investigations, and to ensure that reports written by subordinates do not provide false, improper, or incomplete information. This finding included the ALJ's determination that Connors violated General Order 169, concerning the mandatory reporting of unusual incidents in the facility.

Finally, the ALJ found that CCDOC had established other sufficient cause to discipline Connors, based on his violation of several facility rules specified in the disciplinary charges concerning supervision, neglect of duty, investigations, reports, and unbecoming conduct. The ALJ found that CCDOC

had failed to establish Connors violated a CCDOC standing order concerning IA procedures.

ALJ Pelios upheld the thirty-day suspension. The ALJ found Connors's disciplinary history to be "not particularly noteworthy," although he declined to find it "unremarkable." Connors had five prior written reprimands, three for neglect of duty and one for conduct unbecoming a public employee, and one one-day fine, but no major disciplinary action had been taken against him. Several other incidents were addressed through counseling. No discipline had been imposed on Connors since 2008.[2] The ALJ determined that in light of the paramilitary environment of the correctional facility and Connors's role in the supervisory structure on the day in question, a thirty-day suspension was appropriate and not barred by considerations of progressive discipline.

Connors filed exceptions to the ALJ's decision with the Commission. On January 18, 2019, the Commission, "having made an independent evaluation of the record," issued a final administrative determination adopting the ALJ's findings of fact and initial decision affirming Connors's suspension.

This appeal followed. Connors argues that the Commission erred because it adopted the ALJ's opinion, which: (1) did not include credibility findings on

---

[2] The ALJ erroneously referred to 2009 in his opinion.

disputed facts; (2) did not address Connors's argument that CCDOC did not comply with the forty-five-day rule, <u>see</u> N.J.S.A. 30:8-18.2; (3) violated Connors' due process rights by relying on his internal affairs interview, which was conducted without notice to him that he was a target of the investigation; and (4) suspended Connors without first imposing progressive discipline.

## II.

Our role in reviewing the decision of an administrative agency is limited. <u>Circus Liquors, Inc. v. Middletown Twp.</u>, 199 N.J. 1, 9 (2009). We will not disturb the determination of the Commission absent a showing "that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies expressed or implicit in the civil service act." <u>Campbell v. Dep't of Civil Serv.</u>, 39 N.J. 556, 562 (1963).

Decisions of administrative agencies carry with them a presumption of reasonableness. <u>In re Carroll</u>, 339 N.J. Super. 429, 437 (App. Div. 2001). Moreover, "[a]ppellate courts must defer to an agency's expertise and superior knowledge of a particular field." <u>Greenwood v. State Police Training Ctr.</u>, 127 N.J. 500, 513 (1992). However, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." <u>Mayflower Sec. Co. v. Bureau of Sec.</u>, 64 N.J. 85, 93 (1973).

"There is no constitutional or statutory right to a government job." State-Operated Sch. Dist. v. Gaines, 309 N.J. Super. 327, 334 (App. Div. 1998). Civil Service employees' rights and duties are governed by the Civil Service Act, which provides that a public employee may be subject to major discipline for various employment-related offenses. N.J.S.A. 11A:2-6; N.J.A.C. 4A:2-2.3. In an appeal from a disciplinary action or ruling by an appointing authority, the appointing authority bears the burden of proof to show, by a preponderance of the evidence, that the action taken was appropriate. N.J.S.A. 11A:2-21; N.J.A.C. 4A:2-1.4(a); In re Polk, 90 N.J. 550, 560 (1982).

Having carefully reviewed Connors's arguments in light of the record and applicable legal principles, we conclude the Commission's final agency decision is sufficiently supported by the record and is not arbitrary, capricious, or unreasonable. We add the following comments.

While it is true that the ALJ did not expressly state that he found the testimony of any witness to be credible, it is clear from his findings of fact that he found that Connors was aware of the incident on the day in question, that Jacob told him King had defaced inmate property, that Connors failed to complete a report detailing that information, and that Connors did not complete

an investigation of the incident or memorialize any of the interviews he conducted, or recommend disciplinary action against King.

Connors argues that the ALJ did not make a specific finding with respect to whether Pierce submitted a timely report to IA. The ALJ's opinion suggests that he found Pierce's testimony on this point credible. The ALJ notes that IA was in possession of the original photographs and could not have obtained them other than as an attachment to Pierce's report. However, even if the question of Pierce's submission of a report to IA was not resolved, Connors admitted that he instructed Pierce to make the report intentionally vague, thereby omitting critical information of which Connors was aware. This fact alone is sufficient support for the disciplinary charges.

We are not persuaded by Connors's arguments regarding his right to representation when interviewed by Jones. See NLRB v. J. Weingarten, Inc., 420 U.S. 251 (1975); In re Univ. of Med. & Dentistry of N.J., 144 N.J. 511, 526-528 (1996). An employee is "entitled to the Weingarten right during the investigation only if he reasonably believed that disciplinary action might result." Id. at 529. "The reasonable belief standard is guided by 'objective standards under all the circumstances of the case.'" Ibid. (quoting Weingarten, 420 U.S. at 257). An employee must be advised of the right to representation

prior to the start of questioning when they are the subject of the investigation and the right to representation attaches only once the employee "requests representation and reasonably believes the interview may result in disciplinary action." Id. at 526.

The record supports the conclusion that when Connors was interviewed, Jones thought Connors was a witness, not a target, of the investigation. The charges against Connors are based on his failure to memorialize Jacob's accusation against King and detail the interviews he conducted, his instruction to Pierce to write an intentionally vague report for submission to IA, and his failure to recommend discipline against King. That information was obtained during Jones's interview with Connors, not prior to the interview, and was not, as suggested by Connors, readily apparent from the vague report Pierce filed with IA.

We also see no basis to reverse the Commission's final agency decision based on the forty-five-day rule. N.J.S.A. 30:8-18.2 provides in relevant part:

> [a] person shall not be removed from employment or a position as a county correctional police officer, or suspended, fined or reduced in rank for a violation of the internal rules and regulations established for the conduct of employees of the county corrections department, unless a complaint charging a violation of those rules and regulations is filed no later than the 45th day after the date on which the person filing the

complaint obtained sufficient information to file the matter upon which the complaint is based. A failure to comply with this section shall require a dismissal of the complaint.

Under an analogous statute governing discipline of State Police Officers, courts have evaluated the "sufficient information" provision that starts the forty-five-day clock. See N.J.S.A. 53:1-33. Under that statute, "it is not the happening of the event giving rise to discipline that starts the clock for purposes of evaluating timeliness, but the receipt of 'sufficient information' by the one who is authorized to file the charge that is significant." Roberts v. Div. of State Police, 191 N.J. 516, 524 (2007). Receipt of an investigative report to the supervisor permitted to file charges, will satisfy the sufficient information requirement. Ibid.

The record supports the conclusion that the forty-five-day clock began on January 7, 2015, when Jones submitted his report and recommendation for discipline to the warden. The warden, not Jones, is the supervisor authorized to submit charges against Connors. The formal charges were brought against Connors on February 6, 2015, thirty days after sufficient information to do so was received by the warden.

We disagree with Connors's argument that the forty-five-day clock began when Pierce filed his report on November 9, 2014, or when Carr filed his

complaint on December 1, 2014. Those documents did not provide sufficient information to bring charges against Connors. While it was apparent on those dates that Connors had not filed a report about the incident, the full context of his actions, including the fact that he had interviewed many witnesses, including one who accused King, and had directed Pierce to file a vague report with IA omitting that information, were not known to those authorized to file charges.

We also reject Connors's argument that the Commission erred by not imposing progressive discipline. Generally, the severity of a public employee's discipline should increase incrementally. In re Herrmann, 192 N.J. 19, 33 (2007). However, progressive discipline can be waived if "the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when [its] application . . . would be contrary to the public interest." Ibid.; see also In re Stallworth, 208 N.J. 182, 196-197 (2011); Div. of State Police v. Jiras, 305 N.J. Super. 476, 478-82 (App. Div. 1997) (finding bypass of progressive discipline appropriate after State Trooper assaulted a prisoner, rendering the Trooper unable to function as a law enforcement officer).

As the ALJ aptly noted, Connors's disciplinary history was not sterling. He had on several occasions previously been found to have neglected his duties

and to have engaged in conduct unbecoming of a public employee. In addition, the current charges involve actions that undermine the command structure at the correctional facility, discourage officers from reporting misconduct by other officers, and potentially left Carr in a dangerous position, as his name had been scrawled on the personal photographs of inmates, but complete information about the incident had not been memorialized.

To the extent we have not addressed Connors's other arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

16

A-2779-18